**Paul James ROTEN, Jr., Special Administrator of the Estate of Paul James Roten, III, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 93–2041.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

Feb. 16, 1994.

As Amended May 3, 1994.

Charles R. Karr, Karr, Hutchinson & Stubblefield, Fort Smith, AR, for plaintiff.

David N. Blackorby, Asst. U.S. Atty., Fort Smith, AR, for defendant.

## MEMORANDUM OPINION

HENDREN, District Judge.

Plaintiff brings this wrongful death action under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* The Court has jurisdiction under 28 U.S.C. § 1346(b). Trial to the Court was held on January 24–25, 1994.

### BACKGROUND

On the evening of Saturday, October 6, 1990, Paul James Roten, III (hereinafter called decedent) fell to his death off a sheer bluff in the White Rock Mountain recreation area in northern Franklin County, Arkansas, which is located in the Ozark National Forest.

According to Larry Michael Wilson (Mr. Wilson), decedent accidently fell off a cliff in darkness at approximately 8:30 p.m. as he and Mr. Wilson walked back to a campfire after having been on a wood-gathering expe-

dition. Two other companions of decedent, Michael Binford (Mr. Binford) and Angela Sterling (Ms. Sterling) had accompanied Mr. Wilson and decedent to White Rock that afternoon and had remained at the campfire while Mr. Wilson and decedent went to gather firewood. The proof showed decedent fell some 75 feet and that he died immediately from multiple internal and head injuries.

Because it was dark at the time, Mr. Wilson didn't actually see decedent fall, but heard noises causing him to infer that decedent lost his footing on loose gravel near the edge of the cliff which caused his fall. Mr. Wilson says decedent shouted "Mike" as he fell but made no other utterance or sound.

Decedent and his companions had come to the White Rock area to celebrate Mr. Binford's eighteenth birthday and, although all were then under legal drinking age, had obtained alcoholic beverages for use in their celebration. The proof showed the group persuaded someone of legal age to purchase for them twelve (12) cans of beer; one (1) two-liter bottle of Purple Passion; and one (1) two-liter bottle of Tropical Passion.

The parties arrived at White Rock during daylight and, on their way into the area, passed a sign which reads: "WARNING— HIGH CLIFF AREA—WATCH YOUR CHILDREN". Although decedent's companions recalled seeing the entrance sign identifying the area as White Rock Recreation Area, none of them specifically recalled seeing the said warning sign. However, there is no proof they and decedent (who was driving the vehicle in which they were riding) could not have or should not have seen the warning sign.

Before nightfall and while there was still good daylight, the quartet left their vehicle in a designated parking area and proceeded through a wooded area to the area of the cliffs. According to decedent's companions, the group of four went to the cliff area, observed the view and were well aware they were on high cliffs. At one point, Ms. Sterling commented to Mr. Binford within earshot of decedent that he should be careful about getting too close to the edges of the sheer cliffs.

Other than the warning sign posted along the side of the sole access road to the area by which one must pass in order to get to the cliff area, there are no warning signs concerning the danger represented by the high cliffs which are an integral part of the scenic attractiveness of the White Rock area.

The White Rock area features unrestricted access to the high cliffs area from which the scenic beauty of the area can best be enjoyed. The proof showed that the high cliffs are commonly used by the public for viewing the scenery but also, from time to time they are used by those engaged in the sport of rappelling (i.e., letting oneself down the sheer face of a high cliff with the aid of ropes and other mountain climbing equipment).

The proof showed that, at one point along the cliff area, there exists a stone wall which appears to be some 24 inches to 36 inches in height and some 18 inches to 24 inches in width. This wall was constructed in the 1930s for the apparent purpose of guarding one of the overlook points on the cliffs. There are no other guard walls or guard rails along the edges of the cliffs.

Decedent's companions acknowledge that each of the four consumed various quantities of the alcoholic beverages they had brought with them, but all denied any were intoxicated. The autopsy report showed decedent's blood alcohol level to be 0.04 at the time of his death.

The plaintiff in this case is Paul James Roten, Jr., who is decedent's father and the duly appointed special administrator of decedent's estate with proper authority to bring this action in connection with decedent's death.

Plaintiff says decedent's death was proximately caused by the negligence of the defendant, United States of America, acting thorough the National Park Service, in that the defendant failed to adequately warn decedent and other members of the public concerning the dangers of the cliffs and failed to properly guard the dangerous cliff area so as to prevent accidents such as the one in which decedent lost his life.

In response, defendant says (1) that pursuant to the Arkansas Recreational Use Statute, it has no liability for injuries to citizens using parks and recreation areas without charge except for malicious, but not merely negligent, failure to guard or warn against an ultra-hazardous condition, structure, personal property, use or activity actually known to the owner to be dangerous; and (2) that there is no evidence defendant and its servants and employees are guilty of malicious, rather than merely negligent, failure to guard or warn against an ultra-hazardous condition, structure, personal property, use or activity actually known to defendant to be dangerous.

In a pre-trial ruling, the court agreed with defendant that it is entitled to the benefit of the Arkansas Recreational Use Statute and therefore, in order to recover against the defendant by reason of the death of decedent, plaintiff would be required to prove that the defendant, indeed, was guilty of malicious, as opposed to merely negligent, failure to guard or warn against an ultra-hazardous condition, structure, personal property, use, or activity actually known to the owner to be dangerous.

This matter was tried before the court, sitting without a jury, on January 24 and 25, 1994. Based upon the pleadings, evidence, proof, arguments and other matters before the court, the court sets forth its Findings of Fact and Conclusions of Law in the case as follows:

### FINDINGS OF FACT

1. Plaintiff is a resident and citizen of the Fort Smith District of Sebastian County, Arkansas and was appointed Special Administrator of the Estate of the decedent, Paul James Roten, III, for the purpose of filing this federal tort claim and suit by an Order of the Probate Court for the Fort Smith District of Sebastian County, Arkansas that was entered on August 2, 1993, in Case No. F 91–140(I).

2. The decedent was a resident and citizen of the Fort Smith District of Sebastian County, Arkansas at the time of his death and is survived by his father, Paul James Roten, Jr. (the plaintiff); his mother, Evelyn Anderson; and his sisters, Gretchen Ann

Bryan and Teresa Lynn Inness. All reside in the Fort Smith District of Sebastian County, Arkansas.

3. Franklin County and the Fort Smith District of Sebastian County are located in the Western District of Arkansas, Fort Smith Division.

4. The defendant, United States, owns the Ozark National Forest which includes the White Rock Mountain Recreation Area (White Rock) in northern Franklin County, Arkansas.

5. There is only one entrance/exit road to and from White Rock and along this road is a warning sign which should serve to alert entrants that there are high cliffs in the area.

6. On the evening of October 6, 1990, during darkness and at approximately 8:30 P.M., decedent fell to his death off one of the high cliffs at White Rock.

7. The high cliffs are among the main distinctive features of White Rock which make it a desirable recreation area for the public's use. They are not concealed but, rather, their impressive ruggedness and imposing heights can easily be seen by any visitor during daylight hours. Conversely, the high cliffs can neither be seen nor enjoyed in darkness and their rugged features and sheer heights which make them attractive to the observer in daylight make them quite dangerous to an imprudent wanderer in the darkness.

8. It was and is obvious to all—including decedent—that it was not and is not feasible and safe to be near the edge of the high cliffs after dark, since one can then see nothing of the cliffs so as to visually enjoy them, nor can one then see to safely avoid the obvious dangers posed by the cliffs themselves.

9. Decedent knew where the cliffs were and how high and sheer they were since he and his companions had seen the same in daylight earlier on the day he died and there had been comments made by one of the group about the danger of getting too close to the edge of the cliffs because of the danger of possibly falling.

10. Approximately three weeks before his death, decedent had indicated in a written essay that one of his three greatest fears was "heights".

11. Decedent had consumed alcoholic beverages prior to his fall and his blood/alcohol level was 0.04% when he died.

12. Prior to his fatal fall and after consuming the alcohol, decedent was walking around in the cliffs area in darkness and without the aid of any kind of light.

13. Immediately before his fall, decedent was walking back to the campfire which was known to him to be placed only a few feet from the edge of the cliffs.

14. As decedent walked in darkness toward the fire he, despite his great fear of heights, was walking some five or six feet closer to the cliffs' edge than was his companion, Mr. Wilson.

15. Mr. Wilson says he believes decedent's foot slipped on loose gravel and thus caused him to fall over the cliff's edge some 75 feet to this death. There is no credible evidence to dispute Mr. Wilson's beliefs since they are based, he says, on his recollections of the sounds and impressions he heard and experienced at the time decedent fell, and he is apparently the only one who was close enough to decedent when the fall occurred so as to have any first hand knowledge or sensory impressions as to what did actually happen.

Although the court sees no reason not to accept Mr. Wilson's version of this tragic incident, it feels compelled to make some observations concerning the scenario surrounding decedent's death.

The court finds it somewhat odd that one having a great fear of heights would (a) plan to camp on the top of a very high cliff with a campfire placed within a few feet of the edge of a 70–foot sheer drop-off; (b) walk about, in darkness and without a light, in an area he had observed in daylight to feature rugged terrain and sheer, high cliffs; and (c) walk nearer to the cliffs' edge than his companion, Mr. Wilson, who apparently did not share decedent's great fear of heights.

The court also observes that, while one might conclude that the alcohol consumed by decedent may have clouded or impaired his

teen-aged judgment, that conclusion is not, in the court's judgment, compelled by the total facts revealed by the evidence in the case. Those said total facts, in the court's view, point to the conclusion that decedent's fatal fall was a tragic and unfortunate accident.

16. The placement of additional warning signs along the entrance/exit road; between the parking area and the cliffs area; or along the edges of the cliffs themselves would have provided no more or better warning information to decedent concerning the possibility of falling from the high cliffs than did his own sensory perceptions when he viewed the cliffs area in daylight before his fall. Accordingly, the fact that defendant has not so placed such warning signs does not, in the court's view, amount even to negligence and certainly does not amount to a malicious omission on the part of defendant.

17. While it might properly be supposed that the placement of additional guard walls, guard fences or other barriers along the cliffs' edges would have prevented decedent's death on the theory that their presence might have (a) made it less likely decedent would have slipped, or (b) made it less likely decedent would have fallen off the cliff if he had so slipped, there is no intimation in the proof that the presence of guarding devices would have made it less likely that one fearful of heights who had been drinking would be wandering around the naturally rugged terrain in darkness without the aid of any light.

The court believes it not unreasonable to assume, as apparently defendant and its agents and employees do, that those coming to a recreation area featuring natural, rugged terrain as its main attraction are best guarded and protected by the obvious imposing dangers of the cliffs they come to see, and that the reason for their coming would be destroyed if those very attractions were converted from naturally dangerous and beautiful scenery to man-made guarded areas.

If the court should conclude that defendant should have installed guard walls, guard rails, and/or other guarding devices along the cliffs' edges and now order such to be done, *certain* results of those actions would, in the court's judgment, include: (a) essential desecration of the natural state of the cliffs and deprivation of the scenic enjoyment of same for the general public; and (b) deprivation of enjoyment of the cliffs for those citizens who enjoy the sports of mountain climbing and rappelling. If, on the other hand, it could be confidently said that those *certain* undesirable results would be offset by the *certain* desirable result that the presence of such guarding devices would prevent other deaths similar to decedent's, then perhaps such a finding and order would be justified. In the court's view, such just is not the case.

Under all the circumstances of this unfortunate case, the court does not believe that defendant's failure to install guarding devices along the edges of the cliffs amounted to malicious or even simple negligence.

18. The court heard proof that other fatal accidents had occurred at White Rock in 1970 (a fatal fall on a foggy afternoon); in 1979 or 1980 (a fatal fall in darkness with some evidence of drinking); and in 1990 (approximately three weeks before decedent's death, one Shawn Suter fell to his death).

The unfortunate facts that these three deaths occurred in the cliffs area over the previous twenty years prior to decedent's fall do not, standing alone, tend to clearly establish any particular relevant fact with respect to the circumstances of decedent's death. It is assumed that such evidence was submitted for the purpose of showing that defendant knew, or ought to have known, that a person could accidentally fall from the cliffs and that serious injuries or death could result from such a fall. While in the court's view, as expressed elsewhere in this opinion, those dangerous possibilities were obvious, the said evidence certainly *does* show that defendant and its agents and employees had, or ought to have had, such knowledge prior to decedent's death. However, even in the face of such knowledge, the court is not convinced that defendant should reasonably have been expected to erect more warning signs and/or guarding devices as a result of such deaths or that doing so would necessarily have prevented decedent's death. In the court's opinion, the reasoning set forth in the foregoing

findings still has application so as to support the court's conclusion that defendant's failure to react to the previous deaths by installing more warning signs and/or guarding devices at White Rock did not amount to malicious or even negligent conduct.

19. The court also heard proof concerning (a) the hours of operation of White Rock; (b) whether and when the gate at the entrance to White Rock should be closed; (c) where campfires can or cannot be properly located within White Rock; and (d) whether and when defendant should have had park rangers patrolling the cliffs area.

In the court's view, these matters had no direct bearing on the cause or causes of decedent's death nor upon the question of whether defendant and its agents and employees were maliciously, as opposed to merely negligently, at fault in some relevant way which caused or contributed to decedent's death. Accordingly, the court deems it unnecessary to discuss these matters in any detail.

### CONCLUSIONS OF LAW

1. The purpose of the National Park Service "is to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1.

2. The purpose of the Recreational Use Statute is "to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." *Ark.Code Ann.* § 18–11–301.

3. On January 10, 1994, this Court entered an Order granting partial summary judgment in this matter. In that Order, the Court held that pursuant to the holding in *Mandel v. United States*, 719 F.2d 963, 966 (8th Cir.1983), the United States is entitled to the benefit of *Ark.Code Ann.* § 18–11–301, *et seq.* (the Arkansas Recreational Use Statute—hereinafter called the Recreational Use Statute), if applicable, when it is sued under the Federal Tort Claims Act. The Court then addressed the contents and impact of said statute and now reiterates portions of that discussion. The Recreational Use Statute provides:

Except as specifically recognized by or provided in § 18–11–307, an owner of land who, either directly or indirectly, invites or permits without charge any person to use his property for recreational purposes does not thereby:

(1) Extend any assurance that the lands or premises are safe for any purpose;

(2) Confer upon the person the legal status of an invitee or licensee to whom a duty of care is owed;

(3) Assume responsibility for or incur liability for any injury to person or property caused by an act or omission of such persons;

(4) Assume responsibility for or incur liability for injury to the person or property caused by any natural or artificial condition, structure, or personal property on the land.

*Ark.Code Ann.* § 18–11–307 provides:

Nothing in this subchapter limits in any way liability which otherwise exists:

(1) For malicious, but not mere negligent, failure to guard or warn against an ultra-hazardous condition, structure, personal property, use, or activity actually known to the owner to be dangerous; and

(2) For injury suffered in any case where the owner of land charges the person or persons who enter or go on the land for the recreational use thereof, except that, in the case of land leased to the state, a subdivision thereof, or to a third person, any consideration received by the owner for the lease shall not be deemed a charge within the meaning of this section.

4. In its ruling on the Order for partial summary judgment, the court determined that the White Rock day-use area, which is the relevant area for purposes of this discussion, was available for the public's use without charge for recreational purposes and, therefore, by permitting citizens such as decedent to come into and enjoy White Rock, the defendant did not:

(a) thereby extend any assurance that White Rock was safe for any purpose;

(b) confer upon persons such as decedent the legal status of an invitee or licensee to whom a duty of care is owed;

(c) assume responsibility for or incur liability for any injury to decedent caused by his own act or omission; and

(d) assume responsibility for or incur liability for injury to decedent caused by any natural or artificial condition, structure or personal property within or on White Rock.

Having found the Recreational Use Statute to be applicable and therefore inuring to defendant's benefit in the instant case, the court next considered whether or not the defendant could still be liable in connection with decedent's injuries pursuant to the exception (*Ark.Code Ann.* § 18–11–307(1)—hereinafter called the "§ 307(1) exception") to the non-liability status enjoyed by an owner having the benefit of the said statute. The § 307(1) exception provides that even though an owner will not be liable if he or it enjoys the protection of the Recreational Use Statute, said owner can *still* be liable "for malicious, but not mere negligent, failure to guard or warn against an ultra-hazardous condition, structure, personal property, use, or activity actually known to the owner to be dangerous ..." *Ark.Code Ann.* § 18–11–307(1).

After carefully reviewing the pleadings and all other matters available to the court in connection with the said Motion for partial summary judgment, the Court concluded that there were material facts still in dispute with respect to whether any acts or omissions on defendant's part might cause the defendant to nevertheless be liable with respect to decedent's death pursuant to the said § 307(1) exception. Accordingly, defendant's motion for summary judgment dismissing plaintiff's claim was denied and the matter set for trial on the section § 307(1) exception issue as well as damages, if appropriate.

5. It should be noted that the portion of the Recreational Use Statute providing the exception to non-liability of a landowner has undergone slight changes in the recent past:

(a) The precursor to § 18–11–307(1) provided that a landowner could still be liable for "wilful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity." (*Ark.Stat.Ann.* § 50–1106).

(b) The present statute—*Ark.Code Ann.* § 18–11–307(1)—provides that a landowner can still be liable "for malicious, but not mere negligent, failure to guard or warn against an ultra-hazardous condition, structure, personal property, use, or activity actually known to the owner to be dangerous ..."

The changes from the previous provision to the current provision appear to indicate that (1) mere negligent failure to warn or guard does not invoke the exception; (2) ultrahazardous, as opposed to mere dangerous conditions, structures, personal properties, uses or activities are required to invoke the exception; and (3) for invocation of the exception and resulting liability, the ultra-hazardous condition, structure, personal property, use, or activity must be actually known to the owner to be dangerous.

6. White Rock is precisely the kind of property which is appropriate to be conserved and preserved in its natural state for the scenic enjoyment of the present and future generations.

7. Recognizing that lands suitable for preservation in their natural states because of their inherent, nature-made beauty can also be dangerous because of the very features which make them so suitable, the people's lawmakers enacted the Recreational Use Statute which addressed the very real concerns that an owner of such lands would and should have when opening his or its lands to the public for the public's enjoyment:

(a) Would the owner thereby be offering any assurance that the lands were safe—for any purpose? (The Recreational Use Statute says "No").

(b) Would the owner thereby confer upon any visitor the legal status of an invitee or licensee to whom the owner would owe a duty of care? (The Recreational Use Statute says "No").

(c) Would the owner thereby assume responsibility for or incur liability for any injury to person or property caused by an act or omission of such persons using the lands? (The Recreational Use Statute says "No").

(d) Would the owner thereby assume responsibility for or incur liability for injury to person or property caused by any natural or artificial condition, structure, or personal property on the land? (The Act says "No"):

It follows, therefore, that when White Rock day-use area was made available as a public recreational area by defendant to be used without charge, defendant was justified in concluding that, pursuant to the Recreational Use Statute, defendant was not assuring the public that it was safe for any purpose; was not thus acquiring a duty of care toward anyone using it as invitee or licensee; was not assuming responsibility or incurring liability for any injury caused by an act or omission on the part of anyone using the lands; and was not assuming responsibility or incurring liability for any injury to any person caused by any natural or artificial condition, structure, or personal property on the land.

■ 8. The proof presented at the trial does not establish that defendant maliciously, as opposed to merely negligently, failed to guard or warn the public in general and the decedent in particular against an ultra-hazardous condition, structure, personal property, use, or activity actually known by the defendant to be dangerous.

In *Mandel v. United States*, 545 F.Supp. 907 (W.D.Ark.1982), *rev'd on other grounds* 719 F.2d 963 (8th Cir.1983), the park service had knowledge there were submerged rocks in the Buffalo River, and a park service brochure warned of the danger of submerged rocks in the river. However, it was not known there was a particularly dangerous submerged rock in the Mud Cave swimming hole on the Buffalo River. Plaintiff had asked a park ranger about a good swimming hole on the river and was told that Mud Cave was "where everybody goes and that is where we recommend for you to go". Plaintiff broke his neck when diving into the Mud Cave swimming hole and striking his head on the submerged rock. The Eighth Circuit Court of Appeals found that the ranger's recommendation, plus the knowledge of the park service of the existence and hazard of submerged rocks up and down the river, and the park service's failure to know or to warn of the submerged rock on which plaintiff struck his head would permit inferences to be drawn that (1) the park service would have reason to know of submerged rocks in the swimming area they were recommending; (2) the park service would have reason to believe that an injury was foreseeable, likely or probable; and (3) the rangers's recommendation, with knowledge of the presence of rocks generally, and without knowledge of the rocks in Mud Cave, was a willful and wanton failure to warn against the dangerous condition.

*Mandel* was decided under Arkansas' precursor statute, as mentioned above, but as it is the only similar Arkansas case construing the Recreational Use Statute which has been found, a comparison of the facts in this case with those found in *Mandel* as sufficient to raise a justiciable issue on the question of malicious failure to guard or warn, would appear to be useful and instructive.

The proof in this case does not show the functional equivalent of a hidden, dangerous "submerged rock" with respect to the cliffs as was found with respect to the Mud Cave swimming hole. One may properly suppose (and this court does suppose) that the activity of diving into and swimming in a national scenic river like the Buffalo River features an obvious element of danger and hazard concerning which it would not be reasonably necessary to guard or warn against. Similarly, one may properly suppose (and this court does suppose) that the activity of being on top of a high cliff in a national park recreation area like White Rock for the purpose of either viewing the scenery, rappelling over and down the face of the cliff or hiking along the edge of the cliff would also feature an obvious element of danger and hazard concerning which it would not be reasonably necessary to guard or warn against.

One might further properly suppose that diving or swimming in the river after dark and after having consumed alcohol would be more dangerous and hazardous than doing so in daylight and without having consumed alcohol even as walking around on the top of a high cliff after dark and after consuming alcohol would be more dangerous and hazardous than doing so in daylight and without having consumed alcohol. Common sense would seem to indicate that it should not be reasonably necessary to guard or warn against these activities which obviously would increase the danger and hazard to those unwise enough to do them.

In *Mandel,* the park service knew there could be submerged rocks in the river and that their hidden presence could pose serious and latent danger to one diving or swimming in the river. Notwithstanding these circumstances, the ranger recommended that the plaintiff swim in the Mud Cave swimming hole when he did not know whether it contained a dangerous submerged rock.

In the case at bar, there is no proof (a) that the defendant knew or had any reason to know of any latent danger associated with the high cliffs at White Rock which would be the functional equivalent of the "submerged rock" in *Mandel;* (b) that the defendant recommended that decedent and his companions build a campfire and camp out on the top of the high cliff; or (c) that the defendant knew or had any reason to know that decedent and his companions would be on the top of the cliffs after dark, walking about without any light and after having consumed alcohol.

Even if it could be properly said that the defendant should have posted warning signs telling the public in general and decedent in particular that (a) one should not be on top of the cliffs after dark; (b) one should not build a campfire and prepare to camp out at night on top of the cliffs and within a few feet of the edge of the cliffs; (c) one should not consume alcohol before going out on the cliffs and near their edge; and (d) one should not be walking about on the top of the cliffs after dark and without a light—and this court does not believe defendant was reasonably required to do any of these things—its failure to do so would at best be negligence and would not amount to malicious failure to warn.

In light of the obvious purposes of the Recreational Use Statute, the court is not persuaded that defendant's failure to install guard rails or fences along the edge of the high cliffs from which decedent fell amounted to malicious, as opposed to merely negligent, failure to guard against an ultra-hazardous condition, structure, personal property, use or activity actually known to the defendant to be dangerous. Rather, the court believes that if the defendant were required to install such guard rails or fences along the high cliffs of White Rock the said obvious purposes of the Recreational Use Statute would be defeated and frustrated, not because defendant would otherwise be held to be acting maliciously, but because those using the recreational areas were being negligent and irresponsible in their use of the area.

9. The Court does not believe the high cliff areas of White Rock, a natural phenomenon, should be considered an ultra-hazardous condition as defined by the § 307(1) exception to the Recreational Use Statute. Counsel for defendant advised the Court at the conclusion of trial that the only cases he could find dealing with ultra-hazardous conditions involved man-made structures or conditions, and that he was unable to find any case referring to a natural condition as ultra-hazardous. Plaintiff has cited no case holding to the contrary and the court has likewise found none.

In *Mandel,* a dive into a natural swimming hole led to the plaintiff's injuries. Since, as stated earlier, the precursor statute there considered only referred to a "dangerous condition, use, structure, or activity", the *Mandel* court was not called upon to determine whether a natural swimming hole in a national scenic river would be considered a ultra-hazardous condition. It would seem, however, that it wasn't the natural swimming hole, but rather the concealed presence of the *submerged rock in* the natural swimming hole that constituted the condition which triggered the possibility that the park service could be liable for willful and wanton failure to warn.

10. It is the Court's opinion that since the purpose of the Arkansas Recreational Use Statute is to encourage landowners (including the United States, pursuant to *Mandel*) to make areas available to the public for recreational purposes and thus limit their liability, it is reasonable to conclude that a condition or structure which is natural, as are the high cliffs in this case, should not be considered ultra-hazardous within the meaning of the § 307(1) exception to the said statute.

The Court does not deem it necessary to decide this issue because, even if such conditions should be considered ultra-hazardous, the result in this case would be the same since the Court finds that defendant did not maliciously fail to guard or warn of an ultra-hazardous condition.

11. As discussed earlier, only three (3) fatalities had occurred in the White Rock area in twenty-three (23) years prior to decedent's fall. The court does not believe the facts that these actions occurred and that defendant had knowledge of them requires a conclusion that defendant was malicious in failing to provide additional warnings or to take additional steps beyond those already in place prior to decedent's accident.

12. Having concluded that defendant did not maliciously fail to guard or warn at White Rock so as to incur liability for decedent's death under the § 307(1) exception, it is, of course, unnecessary to consider what "guards" and/or "warnings" might have been required had the court concluded otherwise. Nevertheless, the court observes that plaintiff failed to present any evidence as to what kind of guards or barriers could be constructed by defendant to prevent fatal injuries such as those suffered by decedent and which would, at the same time, conserve the scenery and natural beauty of the cliffs and provide for the enjoyment of cliffs in such a manner and by such means as would leave them "unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. Even the rock wall built in the 1930s next to one of the pavilions was apparently not constructed to prevent falls or resulting injuries. An examination of the photographs and videotape received in evidence shows that the said rock wall was constructed in an area where the cliffs were not steep or sheer as the cliff from which decedent fell. Moreover, if such a wall were to be constructed around all of the cliffs' edges, the same would be, in the court's opinion, an attractive and dangerous invitation for visitors to stand or walk along the top of it and thereby risk a possible fall resulting in either injury or death.

There was no proof as to the feasibility of erecting fences along the cliffs or any suggestion as to how fences would be compatible with aesthetic concerns.

With respect to additional warning signs, there was no suggestion in the proof as to how many signs would be needed, where they should be placed, or how they could be expected to deter decedent and his companions from the dangerous and imprudent conduct which contributed to decedent's unfortunate accident.

While one might heartily wish it to be so, the court is not convinced that there is a way to effectively guard against the dangers of a person's own imprudence or lack of sensible caution when utilizing a rugged area like White Rock.

## CONCLUSION

Although the court is certainly sympathetic to the family of the decedent, Paul Roten, III, because of his unfortunate and untimely death, it is required to determine liability based upon the law as set forth above and as applied to the facts of this case.

The Court must therefore find, based upon the relevant facts and law, that plaintiff has failed to prove that defendant maliciously failed to guard or warn against an ultra-hazardous condition, structure, personal property, use, or activity actually known to the owner to be dangerous, as required by the Arkansas Recreational Use Statute.

IT IS, THEREFORE, ORDERED that plaintiff's complaint against defendant be, and the same hereby is, dismissed with prejudice and a judgment will be entered accordingly.

SO ORDERED.

*JUDGMENT*

Now on this 16th day of February, 1994, for the reasons set forth in the court's accompanying Memorandum Opinion, Judgment is hereby entered for the defendant in this case.

IT IS SO ORDERED.