_____

No. 95-2843
_____

Jason Carlton, Amy Carlton          *
a minor, by Tony Carlton as         *
next friend; Lee Vernon Carlton,    *
heirs to Gaila Carlton; Wanda       *
Mae Carlton, heirs to Gaila         *
Carlton; Ronnie Lee Carlton,        *
heirs to Gaila Carlton; Stevie      *
Lynn Carlton, heirs to Gaila        *
Carlton; Brenda Carlton, heirs      *
to Gaila Carlton; Darren            *
Carlton, a minor, by Lee Vernon     *
Carlton as next friend, heirs       *
to Gaila Carlton; Leah Carlton,     *
a minor, by Alvin Carlton as        *
next friend; Lenora Carlton;        *   Appeal from the United States
Mark Barr David, a minor, by        *   District Court for the Eastern
William "Bill" L. Davis, Jr.,       *   District of Arkansas.
as next friend; Wilbur L. Davis,    *
Jr., also known as Bill L.          *
Davis; Nicole Lambeth; Charles      *
Lee Pigg; Melanie Lynn Pigg, a      *
minor, by Charles Lee Pigg as       *
next friend; Nathan Lee Pigg, a     *
minor by Charles Lee Pigg as        *
next friend; Tammy Rene Pigg;       *
Stephanie Thomason, a minor, by     *
Barbara Thomason, as next           *
friend; Ron Waltham, heirs to       *
Dana Waltham; Sherry Waltham,       *
heirs to Dana Waltham; Ronald       *
Matthew Waltham, a minor, by        *
Ron Waltham as next friend,         *
heirs to Dana Waltham; Sherran      *
Faith Waltham, minor, by Ron        *
Waltham as next friend, heirs       *
to Dana Waltham; Terra Waltham,     *
a minor, by Ron Waltham as next     *
friend, heirs to Dana Waltham;      *
Bishop Warren, heirs to David       *
Warren; Patsy Ann Warren, heirs     *
to David Warren; Dwain Warren,      *
heirs to David Warren; Dwight       *
Warren, heirs to Darren Warren;     *
Karren Warren McClain, heirs to     *
David Warren; Timothy Wayne         *
Warren, heirs to David Warren;      *
James Williams, heirs to Jason      *

Williams; Tina Williams, heirs    *
to Jason Williams; Tina    *
Gayvonne Grant, heirs to Jason    *
Williams; James Williams, also    *
known as Jamie Williams, heirs    *
to Jason Williams,    *
   *
       Appellants,    *
   *
       v.    *
   *
Cleburne County, Arkansas;    *
Swinging Bridge Resort; Philip    *
Dodd; Diana Gayle Dodd; Harvey    *
Adcock; Lanny C. Brackett;    *
Randall C. Carlton; Thurman R.    *
Carr; Larry W. Crabtree; Carl    *
D. Foust; Charles Sherlon Foust;*
Lavern Gallaway; Fred New;    *
Delane Wright; Dan Verser; J.D.    *
Kennedy,    *
   *
       Defendants - Appellees,    *
   *
Mary Lou Barnett; Carolyn Sue    *
O'Dwyer,    *
   *
       Defendants,    *
   *
Bob Burkeen; Polly Burkeen,    *
   *
       Defendants - Appellees,    *
   *
John Does, 1 - 18.    *

_____

Submitted: January 11, 1996

Filed: August 21, 1996
_____

Before WOLLMAN, ROSS and MURPHY, Circuit Judges.

_____

ROSS, Circuit Judge.


       Appellants, victims of a bridge collapse in Cleburne County,

Arkansas, or their decedents, appeal from the district court's[1] order granting summary judgment to Cleburne County and its former Quorum Court officials (County appellees) in this 42 U.S.C. § 1983 action. Appellants also appeal from the district court's order granting summary judgment in favor of the Swinging Bridge Resort and its individual owners (Resort appellees) on the appellants' pendent state law claims of negligence.

I.

Cleburne County originally built the Winkley Bridge, also known as the "Swinging Bridge," in 1912. In 1959, the State of Arkansas included the bridge in its state highway system and exercised the power of eminent domain, divesting the County of any equitable or legal claim to title. In 1970, when the state constructed a new bridge, the Swinging Bridge and its approaches were saved from destruction. Although the issue of ownership of the bridge arose some years after the new bridge was constructed, the County nevertheless maintained the bridge and its approaches. For the purposes of this appeal, we will assume without deciding, that the County owned the bridge.

In 1982, the local newspapers reported the results of tests conducted by engineers in response to Quorum Court concerns that the bridge was deteriorating. The engineers reported that the bridge was sturdy, capable of supporting pedestrian traffic for another 50 to 100 years, and that the interior of the cables was shiny and rust free. Although the engineers recommended ultrasound testing on the bridge cables and application of a protective coating on the cables to prevent further rusting, the Quorum Court initiated no further tests or treatment.

---

[1]The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas.

On October 28, 1989, the Swinging Bridge collapsed and fell into the Little Red River, when approximately forty people were on the bridge, swinging it from side to side.  Five people were killed and many others were injured.

Appellants filed this lawsuit against the County and the Quorum Court members under 42 U.S.C. § 1983, alleging deprivation of their substantive due process rights.  Appellants also filed an action against the Resort appellees, who operated a cafe and resort at the bridge site and owned the land upon which a bridge easement lay on one side of the river.  This action was based on pendent state law claims of negligence in failing to warn appellants of an ultrahazardous danger.

The district court granted summary judgment in favor of the County appellees, concluding that appellants failed to establish that a constitutional violation occurred.  The court also granted summary judgment in favor of the Resort appellees, holding that the appellees are immune from suit under Arkansas' Recreational Use Statute.  We affirm.

II.

Nothing in the language of the Due Process Clause imposes upon the state an affirmative obligation to protect or care for particular individuals.  DeShaney v. Winnebago Cty. Dep't of Social Servs., 489 U.S. 189, 195 (1989); Gregory v. City of Rogers, 974 F.2d 1006, 1009 (8th Cir. 1992), cert. denied, 507 U.S. 913 (1993). Rather, the "Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."  DeShaney, 489 U.S. at 195; see also Collins v. City of Harker Heights, 112 S. Ct. 1061, 1069 (1992).  Nevertheless, this court has held that the Due Process Clause imposes a duty on state actors to protect or care for citizens in two situations:  "first, in custodial and other settings in which the state has limited the

-4-

individuals' ability to care for themselves; and second, when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." Gregory, 974 F.2d at 1010 (citing DeShaney, 489 U.S. at 195, 199-200); Sellers v. Baer, 28 F.3d 895, 899 (8th Cir. 1994), cert. denied, 115 S. Ct. 739 (1995). Here, the appellants do not contend that they were ever in "custody" or were otherwise limited in their ability to care for themselves. Therefore, we consider only the "creation of danger" exception, or whether the state affirmatively placed these particular individuals in a position of danger they would not have otherwise encountered.

We stated in Freeman v. Ferguson, 911 F.2d 52, 55 (8th Cir. 1990), that "[i]t is not clear, under DeShaney, how large a role the state must play in the creation of danger and in the creation of vulnerability before it assumes a corresponding constitutional duty to protect. It is clear, though, that at some point such actions do create such a duty." Cases where the duty to protect has arisen have consistently involved affirmative conduct by government officials directly responsible for placing particular individuals in a position of danger. See, e.g., L.W. v. Grubbs, 974 F.2d 119, 121-22 (9th Cir. 1992) (state officials knowingly assigned violent, habitual offender to work alone with female prison employee and did not inform her of the risk), cert. denied, 508 U.S. 951 (1993); Medina v. City of Denver, 960 F.2d 1493, 1497 n.5 (10th Cir. 1992) (police officers engaged in a high speed car chase potentially liable for creating a special danger faced by a bicyclist); Freeman, 911 F.2d at 54-55 (police chief prevented protective services from enforcing restraining order against victim's estranged husband); Wood v. Ostrander, 879 F.2d 583, 590 (9th Cir. 1989) (trooper created a danger by impounding car and abandoning female passenger in a high crime area at 2:30 a.m.), cert. denied, 498 U.S. 938 (1990); Wells v. Walker, 852 F.2d 368, 370-71 (8th Cir. 1988) (state officials created a danger when released prisoner with violent propensities was transported to

-5-

victim's store without warning), cert. denied, 489 U.S. 1012 (1989). In these cases the courts have uniformly held that state actors may be liable if they affirmatively created the plaintiffs' peril or acted to render them more vulnerable to danger. See DeShaney, 489 U.S. at 201. In other words, the individuals would not have been in harm's way but for the government's affirmative actions.

Appellants assert the County appellees affirmatively placed them in a position of danger they otherwise would not have faced when the appellees, with actual knowledge of the deteriorating condition of the bridge, promoted the bridge as a tourist attraction, had the bridge placed on the National Register of Historic Places, performed cosmetic work on the bridge in order to maintain an attractive appearance, established a park, built a parking lot, removed a warning sign, and promoted the bridge through publications. According to appellants, the County appellees' conduct created the danger by impliedly assuring them of the bridge's safety and encouraging them to be on the bridge, and therefore, the appellees had an affirmative duty to protect against such harm.

Even if we accept as true that the County owned the bridge and knew the bridge was deteriorating but refused to provide any maintenance or repair, we must conclude that no constitutional violation occurred. Mere knowledge of danger to the individual does not create an affirmative duty to protect. DeShaney, 489 U.S. at 200. Simply offering a location as a tourist attraction is not the type of affirmative government action that creates a duty to protect under DeShaney. Appellants allege no affirmative act on the part of government officials directly placing them on the bridge. Nor did the County appellees' actions "create the danger" causing the bridge to collapse. To the contrary, accepting the appellants' allegations as true, the bridge cables broke because of internal corrosion caused by rust. To impose an affirmative duty

-6-

to protect the general public from a situation created by the processes of nature would be to impose upon a county an impossible burden. Finally, neither the County appellees' actions nor inaction placed these particular individuals in a position of danger. Gregory, 974 F.2d at 1010; Wells, 852 F.2d at 370-71. Instead, any action on the part of the County appellees was directed toward members of the general public. There simply was no constitutional deprivation under § 1983 in this case.

III.

Appellants filed pendent state law claims against the Resort appellees alleging the appellees negligently failed to warn them of an ultrahazardous condition. Appellants claim the Resort appellees actively encouraged business from visitors to the bridge by picturing the bridge on their brochures and postcards and calling their operation the Swinging Bridge Resort. Appellants also allege the Resort appellees had actual knowledge of the condition of the bridge, having been among those to bring its condition to the attention of the County appellees, but in spite of this knowledge, the Resort appellees took no action to warn visitors to the bridge of the dangerous condition.

In order to "encourage owners of land to make land and water areas available to the public for recreational purposes," the Arkansas Recreational Use Statute (the Act) generally immunizes a landowner from liability when an individual is injured while on the land for recreational purposes. Ark. Code Ann. § 18-11-301. Specifically, the Act provides that "an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes or to give any warning of a dangerous condition, use, structure, or activity on the premises to persons entering for recreational purposes." Ark. Code Ann. § 18-11-304. The Act, however, does not limit a landowner's liability for "malicious, but not mere negligent, failure to guard or warn

-7-

against an ultra-hazardous condition . . . actually known to the owner to be dangerous," Ark. Code Ann. § 18-11-307(1), or where the landowner "charges the person or persons who enter or go on the land for the recreational use thereof." Ark. Code Ann. § 18-11-307(2).

Appellants concede they were visiting the bridge for recreational purposes. However, they contend the Resort appellees nevertheless remain liable under the two exceptions to the Act. First, appellants argue that because the Resort appellees operated a business near the bridge site and collected revenue from bridge visitors, this was not a gratuitous undertaking as envisioned by the Act, and therefore the "charge" exception to the Act is triggered. We disagree.

The immunity of the Act applies if the person uses the property without charge of "an admission fee for permission to go upon or use the land." Ark. Code Ann. § 18-11-302(4). It is uncontroverted that the appellants did not pay a fee to the Resort appellees or any other entity for admission to or use of the land, or to enjoy the privilege of sightseeing at the bridge. Even if the presence of a business enterprise adjacent to the bridge was found to be legally significant, which itself is questionable, it is undisputed that none of the appellants, nor any member of their groups, went to the diner or the trout dock as customers on the day the bridge collapsed. In fact, the diner was closed and none of the appellants had registered as customers of the resort. Instead, they merely parked on the Resort appellees' parking lot, without charge, to sightsee at a public bridge. This court has held that "[c]onsideration [under the Act] should not be deemed given unless it is a charge necessary to utilize the overall benefits of a recreational area so that it may be regarded as an entrance or admission fee." Wilson v. United States, 989 F.2d 953, 957 (8th Cir. 1993). Because there was no entrance fee, or any other fee of any kind, paid in the instant case, we conclude the "charge"

exception to the Act does not apply.

Appellants also argue the Resort appellees remain liable under the second exception to the Act, which provides that a landowner will not enjoy immunity where he or she maliciously fails to guard or warn against an ultrahazardous condition actually known to the landowner to be dangerous.  Ark. Code Ann. § 18-11-307(1).  In order to support their claim under this theory, appellants are required to prove not only that the Swinging Bridge was an ultrahazardous structure actually known by the Resort appellees to be dangerous, but also that the Resort appellees maliciously, not merely negligently, failed to guard or warn them of this dangerous condition.

As the district court noted, no Arkansas court has interpreted "ultrahazardous" as used under the Act.  In a similar situation, this court applied the Restatement (Second) of Torts, § 520, in order to define "ultrahazardous" under Missouri's Recreational Use Statute where neither the Missouri statute, nor the courts, had defined the term.  Henderson v. United States, 965 F.2d 1488, 1495 (8th Cir. 1992).  Appellants take issue with this reliance on § 520,[2] as applied in strict liability cases, arguing that such a concept has no rational relationship to recreational use statutes.

---

[2]The Restatement (Second) of Torts § 520 provides that in determining whether an activity is abnormally dangerous the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;
(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on; and
(f) extent to which its value to the community is outweighed by its dangerous attributes.

Instead, they advocate a broader definition of "ultrahazardous" and assert that a noticeably deteriorating bridge ready to collapse could be found by a jury to be an ultrahazardous condition.

We do not need to decide this issue, however, because even if we were to assume the bridge was an ultrahazardous structure, the appellants have offered no evidence to show the appellees either actually knew the bridge constituted a dangerous condition or that they maliciously failed to warn or guard against the danger.

With respect to the Resort appellees' actual knowledge of the dangerous condition, the appellants assert that Gayle Dodd, one of the Resort appellees, knew of the deterioration of the bridge and even campaigned for its inspection and repair. The inspection was subsequently conducted, however, and the engineers ultimately reported that the structure was sound. Appellants have not contested the Resort appellees' statement of undisputed facts that the problems with the bridge, brought to the attention of officials in 1982, were repaired, or that the Resort appellees did not hear of any problems with the bridge since that time. The undisputed facts also show that several of the Resort appellees frequently walked on the bridge themselves, including just two weeks prior to its collapse. We agree with the district court's conclusion that the appellants have failed to create a fact issue showing that the Resort appellees actually knew the bridge was dangerous.

We also agree with the district court that the appellants have failed to present a question of fact tending to prove that the Resort appellees maliciously failed to warn the appellants or guard against the alleged ultrahazardous condition of the bridge. In Henderson, 965 F.2d at 1494, this court determined that the term "malicious," as used in Missouri's Recreational Use Statute, was malice in its legal sense. In Arkansas, "malice" is inferred where "the negligent party knew, or had reason to believe, that his act of negligence was about to inflict injury, and that he continued in

-10-

his course with a conscious indifference to the consequences." Stein v. Lukas, 823 S.W.2d 832, 834 (Ark. 1992) (quoting Missouri Pacific R.R. v. Mackey, 760 S.W.2d. 59, 63 (Ark. 1988), cert. denied, 490 U.S. 1067 (1989)) (further citations omitted).

Appellants have offered no facts to support the theory that Resort appellees maliciously failed to warn. There is no evidence that the appellees knew the bridge was about to collapse, yet continued their course of conduct with a conscious indifference to these consequences. In Roten v. United States, 850 F. Supp. 786, 794-95 (W.D. Ark. 1994), aff'd, 39 F.3d 1184 (8th Cir. 1994), the district court held that the government's failure to install guarding devices prior to a boy's fall from cliffs in a national recreational area was not malicious under Ark. Code Ann. § 18-11-307(1), despite the fact that there had been three prior falls from the obviously dangerous cliffs. The cliffs in Roten posed an obvious danger, in contrast to the collapse of the Swinging Bridge, which was an unforeseen occurrence that even the engineers who inspected the bridge were unable to predict. Appellants again point to appellee Gayle Dodd's knowledge of needed repairs as evidence supporting their contention that the Resort appellees acted maliciously. This evidence, however, supports precisely the contrary conclusion. The district court properly concluded that the Resort appellees were immune under the Act.

IV.

In conclusion, we affirm the district court's grant of summary judgment in favor of the County and Resort appellees.

A true copy.

    Attest:

            CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-11-