Sylvia AVALOS, Mother and Next Friend of Nicholas Vasquez, a Minor Child and Incapacitated Person; Nicholas Vasquez; and Miguel "Michael" Vasquez Plaintiffs,

v.

CITY OF GLENWOOD, City of Council Bluffs, Mills County, Harrison County, Pottawattamie County, Gerald "Bo" Wake, Dirk Lincoln, Southwest Iowa Multijurisdictional Drug Task Force, John Doe I, John Doe II, John Doe III, John Doe IV, and Jane Doe, Defendants.

No. 1–01–CV–90055.

United States District Court, S.D. Iowa, Western Division.

July 3, 2003.

John A. Kinney, Omaha, NE, for Plaintiff.

Scott J. Beattie, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

On May 11, 2001, forty-three year old Karl Voll knocked on the door of Plaintiff Sylvia Avalos's home and then shot her seventeen year old son, Nicholas Vasquez, in the head at point blank range. Plaintiffs, Sylvia Avalos, and Nicholas and Miguel Vasquez, now bring this action against the individual and municipal Defendants pursuant to 42 U.S.C. § 1983, for alleged violations of Plaintiffs' Fourth and Fourteenth Amendment rights under the United States Constitution. Plaintiffs' Complaint also states common law claims for conspiracy and negligence. Defendants moved for summary judgment on all of Plaintiffs' claims. Plaintiffs resisted the motion, and the parties filed briefs and affidavits in support and opposition of the motion. The Court heard oral argument from both sides during a May 5, 2003 hearing in Council Bluffs, Iowa. The matter is fully submitted. As detailed below, Defendants' Motion is granted in part and denied in part.

## I. SUMMARY JUDGMENT STANDARD

Rule 1 of the Federal Rules of Civil Procedure mandates that all Rules, including Rule 56, "be construed and administered to secure the just, speedy, and inexpensive determination of every action." Accordingly, summary judgment is not a paper trial. "The district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment this Court has but one task, to decide, based on the evidence of record as identified in the parties' moving and resistance papers, whether there is any material dispute of fact that requires a trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); 10 *Wright, Miller & Kane* § 2712, at 574–78. The parties then share the burden of identifying the evidence that will facilitate this assessment. *Waldridge,* 24 F.3d at 921.

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Walsh v. United States,* 31 F.3d 696, 698 (8th Cir.1994); *United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir.1990); *Woodsmith Publ'g v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990). The moving party must establish its right to judgment with such clarity that there is no room for controversy. *Jewson v. Mayo Clinic,* 691 F.2d 405, 408 (8th Cir.1982).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden, the

nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed.R.Civ.P. 56(c),(e); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of some alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## II. FACTUAL BACKGROUND

### A. The Parties

Plaintiffs Sylvia Avalos and her sons, Miguel "Michael" Vasquez and Nicholas Vasquez, moved to Glenwood, Iowa from California in 1995, along with Avalos' three other children, Jeremy Hogan, Jade and Jonathon Avalos. Plaintiffs are all Hispanic. When the events in this case culminated in May of 2001, Nicholas and Michael Vasquez were seventeen and eighteen years old respectively.

Glenwood, Iowa is located in Mills County near the southwest corner of the State. Reports from the 2000 Census place the population of Glenwood at 5358 residents, seventy-nine of whom are Hispanic or Latino. The Glenwood Police Department consists of a chief of police and ten subordinate officers. Captain Dirk Lincoln was at all relevant times employed as a police officer with the Glenwood Police Department.

Until July of 1998, Defendant Detective Gerald "Bo" Wake was an officer with the Glenwood Police Department. From July 1998 until present, Detective Wake has been employed as a police officer with the City of Council Bluffs, Iowa. During the spring of 2001, while still employed by Council Bluffs, Wake was assigned as an investigator with the Southwest Iowa Multijurisdictional Drug Task Force.

The Southwest Iowa Multijurisdictional Drug Task Force ("Task Force" or "Drug Task Force") was created on July 1, 1999, the effective date of the "Southwest Iowa Multijurisdictional Drug Task Force Agreement" ("28E Agreement") between the several municipal Defendants. Pursuant to Iowa Code Chapter 28E State and local government entities in Iowa may enter into such agreements for the joint exercise of governmental powers. The Task Force is not a separate governmental entity, but a collaborative effort by the Police Departments of Council Bluffs and Glenwood, Iowa; the Sheriff's Departments of Mills, Harrison, and Pottawattamie Counties, "to exchange assistance as required to enforce the drug laws of the State of Iowa and eradicate the drug problems in Council Bluffs, Glenwood, and the smaller communities and rural areas of Pottawattamie, Iowa." (Preamble, Southwest Iowa Multijurisdictional Drug Task Force Agreement, Def.App. at 301). Under the 28E Agreement, officers from the various communities are assigned to the Task Force, but the responsibility of paying the assigned officers' wages and benefits remain with the employing agency. In the spring of 2001, the task force consisted of Unit Supervisor Lieutenant Michael Terry, an Operations Supervisor, an office manager, and eight Investigators–Officer Wake and four others from the Council Bluffs Police Department, two from the Pottawattamie Sheriff's Department, and one from the Mills County Sheriff's Department.

Administration of the 28E Agreement Task Force is charged to an Executive Committee comprised of the Sheriffs and Chiefs of Police, or their designees, of the participating municipalities. The 28E Agreement requires the Executive Committee to meet quarterly "to discuss task force cases and methods or tactics to be utilized for the enforcement of drug laws." (28E Agreement, § 4, Def.App. at 302). As well, the 28E Agreement mandates that "[t]he Executive Committee shall establish uniform rules and regulations for the giving and receiving of aid." *Id.* The uniform rules and regulations currently in place are found in a manual entitled "Southwest Iowa Narcotics Enforcement Task Force Policies and Procedures." The policies and procedures contained therein were approved by the Board of Directors of the Southwest Iowa Narcotics Enforcement Task Force (the apparent predecessor to the current Task Force) on September 29, 1995. Relevant to this case, the manual contains policies, procedures, and forms pertaining to the use of confidential informants during investigations.

## B. Factual Background

The actions and events that form the basis for Plaintiffs' claims can be viewed as two discrete series of events. First, Plaintiffs allege that between 1995 through the spring of 2001, they were subject to numerous incidents of harassment and discrimination by the Glenwood Police Department and the Mills County Sheriff's

Department. The second set of events begins on April 5, 2001 when Karl Voll first became involved in the investigation of Nicholas and Michael Vasquez and ends with the shooting of Nicholas Vasquez on May 11, 2001. The Court will, therefore, review each of these periods separately for the sake of clarity.

## C. General allegations of discriminatory and harassing conduct

As noted, Plaintiffs contend that they were unduly scrutinized and harassed by law enforcement officials from Glenwood and Mills County from the time they moved to Glenwood, Iowa in 1995 until May of 2001 when Nicholas was shot by Karl Voll.[1] Much of the alleged harassment involves informal actions such as Glenwood police officers following Plaintiffs' cars, police officers parking in front of the Plaintiffs' home or across the street, and stopping Plaintiffs while they were walking. Plaintiffs also allege that they have been stopped by Glenwood police officers an inordinate number of times while driving, most often under the alleged pretext that their names appeared on a "suspended license list." During her deposition, Avalos was able to recall only one specific incident in which she herself was stopped. In that instance Ms. Avalos testified that she was legitimately cited by Officer Wake, then of the Glenwood Police Department, for having a suspended driver's license. During the stop, Avalos claims

---

1. As this is Defendants' Motion for Summary Judgment, the Court reviews the facts in a light most favorable to Plaintiffs. In considering Plaintiffs' allegations in relation to their claims, however, the Court remains constrained by the standards of the Federal Rules of Evidence; that is, facts must be relevant and admissible. *See Firemen's Fund Ins. Co. v. Thien,* 8 F.3d 1307, 1310 (8th Cir.1993) ("The district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.") (internal citations omitted). In resisting Defendants' Motion, Plaintiffs detail a number of incidents involving Jeremy Hogan, Jade Avalos, and other persons who are not parties to this litigation. As well, Plaintiffs support many of their allegations with only hearsay statements from Sylvia Avalos's deposition testimony. The large majority of these allegations would be inadmissible at trial, and the Court must disregard the same at this stage of the proceedings.

she was taunted and harassed by Officer Wake based on a confrontation she had recently had with Wake after Wake stopped Michael Vasquez for having a dragging mudflap. *See infra.* With this one exception, Avalos simply contends that the stops of her and her family over the years were too numerous to list. Michael Vasquez and Jeremy Hogan also testified, both with and without specifics, to a number of instances in which either they or their brother Nicholas were stopped for driving with a suspended license, but in only one instance involving Jeremy was a citation issued. In the large majority of cases, the officer making the traffic stop allowed the offending driver to lock the car and either walk or be driven home.

### 1. Incidents involving Michael Vasquez

Beyond traffic stops involving suspended licenses, Michael Vasquez testified to two other significant interactions between himself and Glenwood Police.[2] At some point in 1998, Officer Wake, while still employed with the Glenwood Police Department, followed Michael home and then made a traffic stop as Michael pulled into his driveway because of a dangling mud flap. Sylvia Avalos witnessed the stop from inside her home and came out to confront Officer Wake. A heated exchange ensued between Avalos and Wake during which Avalos ac-

cused Wake of harassing her family because of their race. Wake replied "[y]ou people are always trying to get away with things." Upon hearing the term "you people," Avalos became incensed and believed that Officer Wake intended the phrase as a racial slur towards Hispanics. Avalos complained about the comment and racially biased police harassment to then Police Chief Steve Liddell. After Officer Wake denied that the comment was motivated by racist intent,[3] Chief Liddell ended his investigation. During the course of Ms. Avalos making the complaint and the subsequent investigation, Chief Liddell took no notes, nor did he prepare a single report or file. Liddell testified that it was not procedure to prepare a report for discrimination claims.[4]

In the summer of 2000, Michael Vasquez was stopped by Officer P. Martin of the Glenwood Police Department because Michael was not the registered owner of the vehicle he was driving. The car was not stolen, and was in fact registered to Avalos's boyfriend, Nicholas Hernandez. Officer Martin testified that he became suspicious because Michael was "sweating profusely."[5] Michael insisted that the sweating was due to a combination of the hot summer night and the fact that Michael had been dancing all night at a club

---

2. Plaintiffs' Statement of Facts contends that Michael was the only person cited for possession of a controlled substance, Iowa Code § 124.401(5), when marijuana was discovered in a Mills County hotel room, "even though nearly all the other individuals each claimed ownership of the marijuana." (¶ 14, Pl. Statement of Facts). Plaintiffs support this contention, however, with only the deposition testimony of Sylvia Avalos who was not present during the incident. Conflicting statements from the arresting officer contend that Michael admitted to ownership of the contraband. Michael eventually pleaded guilty to a lesser charge of gathering where controlled substances are being used. *See* Iowa Code § 124.407.

3. Wake contends that his comment "you people are always trying to get away with things," referred to Avalos and her family, and that it was not an implication of Hispanics as a whole.

4. Avalos contends that Chief Liddell told her that while such behavior (racial discrimination) did occur in past administrations, it was not going to happen during his. Liddell denied ever making such a statement.

5. Chief Liddell defended Officer Martin's actions with the suggestion that excessive perspiration could be an indication of methamphetamine use.

in Omaha, Nebraska.[6] Officer Martin performed neither a field sobriety test nor a breath test on Michael at any time during the stop. Instead, Michael was simply handcuffed and made to sit on the curb. When Michael challenged Officer Martin's motives, noting that the car was not stolen, that he had a valid license, that he had not been drinking, and that he was not in violation of a curfew because of his age, Officer Martin responded by placing Michael in the back of his police cruiser. Officer Martin attempted to radio for a K-9 unit, but was unsuccessful. Nevertheless, and without consent, Officer Martin commenced a forty-five minute search of the vehicle looking for a hidden or concealed compartment used for smuggling drugs, all the while asking Michael if he, his mother, or any of his family members were trafficking drugs from California. When the search proved fruitless, Michael was released. Beyond the fact that Michael was not the registered owner of the vehicle and that he was sweating, no justification for the traffic stop or vehicle search was ever offered.

## 2. Incidents specific to Nicholas Vasquez

Plaintiffs identify one specific incident involving Nicholas Vasquez and two odd occurrences that Plaintiffs contend were often repeated over the years. In the first instance, Nicholas was arrested by the Mills County Sheriff's Department for possession of marijuana while at a nearby lake with some friends. The arresting officer testified that the three individuals were either in or around their vehicle which was parked in high grass near the edge of a tree line. When the officer approached, he claims to have witnessed Nicholas walk into the trees and drop a plastic baggy.

The officer retrieved the baggy and found that it contained marijuana. Nick Garmoe, one of the other boys present, testified that he told the officer that the marijuana was his. Regardless, only Nicholas Vasquez was handcuffed and placed in the back of the police cruiser. The other boys were directed to follow the officer to the police station in their own vehicle. No charges were filed against Nicholas as a result of this arrest.

Plaintiffs' other allegations specifically involving Nicholas occurred at some point in 1995 or 1996. On one occasion Nicholas and Michael Vasquez were walking when Officer Denise Jens of the Glenwood Police Department pulled alongside them in her cruiser and asked whether they had any weapons. After the brothers denied being armed, Officer Jens ordered the boys to lift up their shirts and spin around. After watching the Vasquez brothers' revolution, Officer Jens drove away without explanation. On another occasion, Nicholas Vasquez and his friend Nick Garmoe were walking home from the store when police officers stopped them on the sidewalk, made them take off their shoes, patted them down, and then drove off without incident or explanation.

## 3. Police presence at Avalos's home

Plaintiffs generally contend that officers of the Glenwood Police Department made a habit of driving past Avalos's home, parking in her driveway or across the street with no explanation, and parking at a school just down the street for long periods of time to watch the house. As well, Plaintiffs offer three relevant instances in which police officers either entered the home or appeared at the door to accuse Plaintiffs of various infractions.[7] In the first instance, Avalos contends that

---

**6.** Omaha is approximately twenty-five miles from Glenwood.

**7.** Plaintiffs also detail an incident in which police officers came to the home in 2001 while Jeremy Hogan was entertaining friends and watching a basketball game, but, as noted above, Jeremy Hogan is not a party to this action.

Officer Jens appeared at her home in the middle of the night to insist that Avalos sign a document related to a suspended license violation. Avalos refused and told Officer Jens to return at a decent hour. When Avalos turned and walked back into her house, Officer Jens followed her inside, uninvited, and demanded that Avalos sign the document. Officer Jens left after Avalos relented and signed the document. On another occasion, Captain Dirk Lincoln came to Avalos's home after receiving a call that the Vasquez brothers were discharging a firearm within the city limits. Upon Captain Lincoln's arrival, however, shots were heard at another location and Captain Lincoln left.

In February 1999, officers from the Glenwood Police Department and the Task Force executed a search warrant on Avalos's home. The search came after police received information from a confidential informant that the informant had, that day, purchased marijuana from Jeremy Hogan. As well, the informant stated that Hogan claimed that he had "just picked" the marijuana, and the informant claimed that he had seen more marijuana while in the Avalos home. Plaintiffs contend that when the Task Force executed the warrant, the officers failed to identify themselves as police officers, had nothing on their uniforms identifying them as police officers, and gave no indication that they were executing a valid search warrant. Rather, Plaintiffs allege that when Jeremy Hogan answered a knock on the door at four in the morning, a number of armed and masked individuals clad in camouflage pants and black sweaters charged into the house and rounded up the occupants in the living room. With the exception of Jade and Jonathon Avalos, all occupants were handcuffed while the officers turned over couches and furniture, emptied boxes of cereal, and generally ransacked the house in search of evidence of marijuana harvesting. The search uncovered nothing more than an innocuous box of sandwich bags, two marijuana stems, and a photograph of an individual smoking a marijuana pipe. Officer Stephen Fornoff, formerly of the Glenwood Police Department, apologized and the police left. No charges were ever filed.

## D. April 5, 2001—May 11, 2001

On April 5, 2001, Captain Dirk Lincoln of the Glenwood Police Department was dispatched to Glenwood High School to investigate a report that a fifteen year old student, Jessica Whetsel, had been caught with several small plastic bags containing a red glassy substance. Upon Captain Lincoln's arrival, Jessica's mother, Maria Voll, was contacted and came to the school. Once her mother arrived, Jessica told Captain Lincoln that the substance was opium, but refused to say where she had obtained it. Maria Voll then told Captain Lincoln that she did not want to answer any more questions until her husband Karl Voll arrived, and the parties went to the Glenwood Police Department where Mr. Voll arrived shortly thereafter. At some point, pursuant to a "protocol personally," based on the quantity of the substance involved, Captain Lincoln contacted the Drug Task Force for assistance. (Def.App. at 278c).

At his criminal trial,[8] Karl Voll testified that when he arrived at the Glenwood Police Department, he asked to have a moment alone with his daughter, during which time Jessica revealed that she had received the substance from Nicholas and Michael Vasquez.[9] (Pl.App. at 367). Karl

---

**8.** Karl Voll was tried and convicted for the attempted murder of Nicholas Vasquez in the Iowa District Court for Mills County. (Mills County No. FECR42505). Any reference in

this opinion to Voll's criminal trial refers to these state court proceedings.

**9.** Jessica had dated Michael Vasquez for a few months the previous summer.

called Captain Lincoln back into the room and asked for specifics regarding Jessica's charges. *Id.* Captain Lincoln replied that the charges were possession of a controlled substance with intent to deliver and trafficking, which Karl understood to be three charges. *Id.* Karl testified that Lincoln then told him that the Task Force Detectives were on their way and asked if Karl would speak to them. *Id.* Karl testified that, given the circumstances he agreed, noting "I guess we don't have a choice really." *Id.* Voll testified that Captain Lincoln "told me that it would be in our best interests to talk to them, that they could 'make things disappear.'"[10] *Id.*

Task Force Detectives Robert Daley and Gerald Wake responded to Captain Lincoln's call for assistance. Upon their arrival, the detectives first spoke with Captain Lincoln. As best as Detective Wake can recall, Lincoln may have indicated that he knew Karl Voll, but Lincoln offered nothing about the surrounding circumstances. (Pl.App. at 382). After being briefed by Captain Lincoln, the Detectives weighed and field tested the substance recovered from Jessica Whetsel. The substance tested negative for opium and slightly positive for heroin.[11] At this point, Detective Wake was fairly certain that the substance was not a narcotic.[12] (Pl.App. at 391).

The Task Force Detectives returned to speak with Jessica and the Volls, and told them that the substance had tested slightly positive for heroin. Jessica and Karl testified that one of the Detectives then informed the family that the only crimes with penalties as high as narcotics trafficking were kidnaping and murder. Detec-

tive Wake claims that the Volls asked him to "put a scare" into Jessica, so, using what he refers to as an "analogy," Wake explained that if the substance were methamphetamine, Jessica would be facing a forty year jail term which would then be doubled because she was caught at school. (Def.App. at 236). Neither of the Volls, however, claim that they asked Wake to scare their daughter. During Voll's criminal trial, Jessica, Karl, and Maria testified that Detective Wake told Jessica that she was facing forty to eighty years in prison. (Def.App. at 48; Pl.App. at 360, 369).

Wake told the Volls that the Detectives did not think that the drugs came from a fifteen year old girl, and that they wanted to go after the ones she got the substance from, the Vasquez brothers. Jessica admitted that she had received the substance from Nicholas and Michael Vasquez and that she owed them fifty dollars for it. By this point, Karl was irate. During the course of the interview, Karl made several threatening statements towards the Vasquez brothers. Wake responded simply by chuckling at Karl's threats, testifying later, "I found him to be a lot more arrogant and a lot more macho than he had cause to be." (Pl.App. at 412). Wake further noted about Karl's demeanor, "I could care less either way," and agreed that "it was kind of laughable or kind of a joke that this guy thought he was so tough when he really wasn't." *Id.* Karl continued with his threats, and later testified that Detective Daley referred to Karl and suggested that they "just turn him loose." (Pl.App. at 371). Karl responded to this comment by saying, "tell you what, give

---

**10.** The summary judgment record is silent on whether Jessica Whetsel was ever informed of her *Miranda* rights.

**11.** Further testing revealed the substance was not a controlled substance, but Dragon's Blood incense.

**12.** Detective Wake admits that he knows little about opium and has never seen the substance. (Pl.App. at 388).

me five minutes, follow me after five minutes and we'll call it a day" *Id.* Daley responded, "in a perfect world, that sounds great." (Def.App. at 40).

Karl initially offered to "wear a wire" to go talk to the Vasquez brothers about the "opium" as a concerned parent. The detectives, however, decided to use Maria Voll as the informant because "first of all, she's a female, she's not as obtrusive[; s]he's not going to go up there and make a lot of threats." (Def.App. at 240). Although initially reluctant, Maria agreed to help her daughter.[13] After Maria agreed to act as a Confidential Informant ("CI"), the Detectives claim that they had her read and sign the CI disclosure forms, and complete a personal history form.[14] Detective Daley noted that "ideally" a complete CI packet would contain a background check, criminal history, fingerprint card, and photographs, "but when we have situations like this, where its happening as we go, our only requirement is to have that packet filled out, signed, and they understand what's going on." (Def.App. at 195). Maria Voll's packet contained none of these items, and no packet whatsoever was created for Karl.

Once Maria signed the forms, she was fitted with an audio transmitter harness ("wire") and given $200 in pre-serialized currency. The Detectives instructed her to go to Avalos's home to talk with the Vasquez brothers and to try to convince them to accept the money as payment for the "opium." Karl, however, refused to allow his wife to go alone and insisted that he be allowed to accompany her. The Detectives acceded and allowed Karl to drive Maria to the Avalos home with an admonition that he remain in the car and not get involved in the transaction.

Upon the Volls arrival at Avalos's home, Karl's voice is first heard over the wire, telling his wife, "[y]ou stay right there. I'm going to the door . . ." (Def.App. at 348). Regardless, Maria initially went to the door alone to talk to the Vasquez brothers. Shortly after she went inside the apartment, however, in rushed Karl. Once inside, Karl began yelling profanities at Nicholas Vasquez, punctuated with the threat, ". . . I'm gonna kill something." *Id.* at 350. As Karl continued his rant, Maria Voll explained that she had taken a substance from Jessica, and that she had come to see the Vasquez brothers to pay off the fifty dollar debt for the substance. Throughout the conversation, Nicholas Vasquez denied giving Jessica anything, claiming instead that the "opium" had been sold to Jessica's friend. Eventually though, Nicholas agreed to accept the money and promised to leave Jessica alone. As, however, the Task Force Detectives had only given Maria twenty dollar bills, she could not provide exact change to settle her daughter's debt. Nobody in the apartment had change either, so Michael Vasquez left to make change at the convenience store next door. When Michael left to get change, Karl and Maria exited the home and started back towards

**13.** During taped interviews after his arrest, and later at his criminal trial, Karl Voll claimed that the Volls had made a deal with the Task Force to participate in the confidential operation in exchange for the charges against Jessica being dropped. Detective Wake claims that Maria participated voluntarily and that such a deal was never offered.

**14.** These documents are not part of the summary judgment record so their existence is unknown. In fact, the record contains only one original document regarding the CI operation, Detective Wake's June 27, 2001 report. In a Confidential report dated April 10, 2001, Detective Wake makes no mention of using either of the Volls as confidential informants. In a second Confidential report dated June 27, 2001, sixteen days after Nicholas Vasquez was shot, Detective Wake supplemented and amended his initial report to include information about the CI operation.

their car. Once out of earshot of theVasquez brothers, Karl menaced, "I'll fuckin' kill him." (Def.App. at 356). At this moment, the Volls again encountered Michael Vasquez as he returned from the convenience store to say that they too had no change. Maria told Michael not to worry about the money, that she would get it from Jessica's friend. As Michael started to protest, Karl interrupted with his last and most direct threat: "... not my kid, but future reference, you tell everybody, if you want to get my kid high, that's the fucking business if my kid wants to get high ... don't give her shit more than enough to cop a buzz on because I will kill you." *Id.*

Shortly after the Volls left the Avalos home and reported back to the Task Force detectives, officers from the Task Force and the Glenwood Police Department arrested Nicholas and Michael Vasquez.[15] Both were charged with felony possession and distribution of counterfeit or simulated controlled substances under Iowa Code § 124.401(1)(c). Michael Vasquez was granted pretrial release on April 11, 2001, and Nicholas Vasquez was released after his mother posted a bond on April 19, 2001. The charges against both brothers were later dismissed.

At some point between April 5, 2001 and May 11, 2001, Karl Voll called Detective Wake at home on a Saturday afternoon, because he was concerned about his daughter's welfare.[16] Karl told Wake that he was concerned that Jessica was still seeing the Vasquez brothers. Karl then told Wake that he had heard rumors, "on the street," that Nicholas and Michael Vasquez intended to kidnap Jessica, take her to an apartment, duct tape her to a chair, and beat her. Karl was unable, however, to say where or from whom he had heard about the threat to Jessica. As the conversation ended, Karl said to Detective Wake "guns aren't my thing anymore but they used to be, and if I have to I'll get a gun and I'll take care of business myself."[17] Wake made no record of the call, made no attempt to contact the Glenwood Police Department about the threats, told none of his supervising officers about the call, and never informed Avalos or her family about the threats.

After the Volls participated in the CI operation for the Task Force, they took Jessica to a juvenile care facility in Council Bluffs, Iowa. After a night in the facility, Jessica ran away. She spent the next two and one half weeks living with friends and in homeless shelters until meeting up with

---

**15.** Detective Daley confirmed Michael Vasquez's allegations that during the arrest, Detective Wake apparently took offense to Michael Vasquez referring to him as "man" or "dude," instead dubbing Michael "shithead." (Def.App. at 197). Detective Wake denies this allegation.

**16.** The actual date on which Karl Voll telephoned Detective Wake's home is not clear. At Voll's criminal trial, Wake testified that he received the call "a couple of weeks, at the least," after April 5, 2001. (Def.App. at 10). In his deposition testimony, Wake testified that he was not certain of the exact time frame of the telephone call, but that it was made "quite awhile," "weeks," before the shooting. (Def.App. at 251). In a taped interview on the night of the shooting, however, either Captain Dirk Lincoln or Special Agent David Jobes of the Iowa Division of Criminal Investigations told Karl that he had spoken with Wake that evening, and that Wake had said "I just talked to that guy about a week ago." (Pl.App. at 350). Karl replied "[t]hat's right." *Id.*

**17.** Karl Voll's quoted statement is taken from Detective Wake's testimony during Voll's criminal trial. Later testimony from Detective Wake contains subtle differences in word choice and syntax that do not significantly alter the meaning of the quotation. The record does not contain a recitation of the phone call from Karl Voll to dispute the accuracy of the quotation.

her parents at a court hearing. After the hearing, Jessica was sent to another inpatient care facility from which she subsequently ran away.

On May 11, 2001, Maria Voll received a summons ordering her to appear and testify against Michael Vasquez. On the same day, the Volls discovered Jessica's whereabouts and went to pick her up. On the way home from collecting Jessica, Karl stopped off at a liquor store and bought a bottle of tequila. He stopped again for a lemon at a grocery store and then continued home. Upon reaching his house, Karl spent the afternoon sitting outside alone drinking the bottle of tequila. When he had finished the bottle, he told Maria Voll that he needed to keep drinking and set off in his truck. Somewhere between eight and nine that evening, Karl knocked on the door at Sylvia Avalos's home, where Nicholas Vasquez, his younger brother and sister, and several friends were eating dinner. Ashley Fink, a friend, answered Karl's knock and told Nicholas that Karl had asked to speak with him. When Nicholas came to the door, he and Karl began to argue. Nicholas then insisted that Karl leave and told Karl that he did not care about his daughter. As Karl was being forced out of the apartment, he drew out a handgun and shot Nicholas Vasquez in the head at point blank range.

## III. DISCUSSION

### A. Substantive Due Process

#### 1. Karl Everett Voll

In the early morning hours of February 12, 1981, Karl Everett Voll pulled into a Cleveland, Ohio Shell station with three others to purchase gasoline. *Ohio v. Voll,* 1982 WL 5906, 1982 Ohio App. LEXIS 11995 at 1–2.[18] While Krcal, the Shell station attendant, pumped gas, Karl Voll entered the station and stabbed Krcal's friend Robert Hines in the neck. *Id.* at 2, 1982 WL 5906. When Hines ran from the station screaming and bleeding from the neck, Karl Voll emerged, knife in hand, and robbed Krcal of his wallet and the station money in his pocket. *Id.* at 2, 4, 1982 WL 5906. Voll then emptied the station register at gunpoint before telling Krcal to start a car. *Id.* Krcal was able to flee and contact the police. *Id.* at 2, 1982 WL 5906. When police officers responded shortly thereafter, they watched Karl Voll pulling a hydraulic jack from the station office loaded with tires and a television. *Id.* Voll fled on foot, but was quickly apprehended. *Id.*

Karl Voll was indicted on five counts: aggravated robbery, aggravated burglary, two drug law violations, and attempted murder. At the close of the State's case, the attempted murder charge was dismissed by the trial court. The jury found Karl guilty on the other four counts, and Voll was sentenced to six to twenty-five years in prison. Karl Voll was paroled on September 17, 1985. Ten months later, he was arrested for felonious assault with a deadly weapon.[19]

On January 8, 1997, Karl Voll spent the afternoon drinking in the local tavern with his in-laws after a funeral. At some point, an argument erupted whereupon Karl left the tavern and returned to his home, followed by three of his wife's relatives. When the in-laws arrived, Karl chased

---

**18.** The facts of Karl Voll's prior felony conviction are not contained in the summary judgment record. Pursuant to the Federal Rules of Evidence, however, the Court may, at any stage in the proceedings, whether requested or not, take judicial notice of any adjudicative facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R.Evid. R. 201(b),(c),(f).

**19.** Voll was acquitted of this charge by a jury.

them out of his house with a small caliber semi-automatic handgun.

When Mills County Sheriff's Deputies responded to a domestic disturbance call at Voll's residence in Pacific Junction, Iowa, they encountered a very intoxicated Voll who denied the allegations. The involved parties were brought back to the house to sort things out. After Karl talked with deputies and continued to deny that he had a gun for the next hour and a half, a gun was found hidden near a tree outside the property. Voll was charged for being a felon in possession of a firearm, a class D felony under Iowa law. *See* Iowa Code § 724.26. Karl eventually pleaded guilty to the lesser charge of assault with intent to cause serious injury, an aggravated misdemeanor. *See* Iowa Code §§ 708.1, 708.2. Accompanying and assisting the Mills County Sheriff's Deputies on the call was Captain Dirk Lincoln of the Glenwood Police Department.

On May 12, 2001, twenty years after stabbing Robert Hines in the neck, Karl Voll was again charged with attempted murder for shooting Nicholas Vasquez in the head at point blank range the night before. This time, however, the charge was not dismissed. Karl Voll was convicted after a jury trial and is currently serving a twenty-five year sentence in the Iowa State Penitentiary.

The series of events that led to the tragic shooting began on April 5, 2001 when Karl Voll came to the Glenwood Police Department to support his stepdaughter and was duped into believing that she was facing a forty to eighty year prison sentence because of the Vasquez brothers.

When Karl then made several violent threats towards the Vasquez brothers, the Task Force detectives laughed and encouraged him. When Karl insisted that he go along with his wife on the CI operation, the Task Force officers let him. At no point, however, did any Task Force officer give pause to investigate the sincerity of Karl's threats, nor did any one bother to investigate Karl's background before deceiving him about his daughter's drug charges and allowing him to accompany his wife to the Avalos home, because Detective Wake "found him to be a lot more arrogant and a lot more macho than he had cause to be." (Pl.App. at 412). Accordingly, even though Karl had completely disregarded Detective Wake's instructions during the CI operation, when Karl Voll contacted Detective Wake at home one Saturday afternoon and made specific threats involving getting a gun to take matters into his own hands, Wake did nothing. Plaintiffs now argue that the actions of Detective Wake and Captain Lincoln, along with the policies and procedures of the Drug Task Force, created a danger to the Vasquez brothers in the form of Karl Voll.[20] Because Defendants' actions created the danger, Plaintiffs argue the Defendants violated Nicholas Vasquez's constitutional right to substantive due process when the Defendants did nothing to protect Nicholas from the danger that manifested itself on May 11, 2001. With one exception, the Court agrees.

**2. Due process and the law of state created dangers**

▆▆▆ The Due Process Clause of the Fourteenth Amendment was intended to

---

**20.** Plaintiffs' Amended Complaint contains a Fifth Claim titled "Municipal Liability," which is not a legal claim. The allegations pleaded in support of this claim, however, indicate that Plaintiffs wished to make clear that all claims were brought against the individually named Defendants and the respective municipal Defendants. The parties have briefed and argued the claims in this manner, and the Court sees no reason to interpret Plaintiffs' Amended Complaint in any other fashion. The Court will, therefore, consider each of Plaintiffs' claims as they apply to all Defendants.

prevent government "from abusing [its] power or employing it as an instrument of oppression." *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (quoting *Davidson v. Cannon,* 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986)). In its substantive form, the Due Process Clause protects individuals from arbitrary or oppressive behavior by government officials. *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 677, 88 L.Ed.2d 662 (1986). Under a substantive due process analysis, for the complained of conduct to rise to the level of a constitutional violation, the question is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 848, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Allegations of negligence and even gross negligence are not sufficient to form the basis of a substantive due process violation claim. *Daniels,* 474 U.S. at 332, 106 S.Ct. 662. The question before the Court today is whether the municipal and individual Defendants violated Nicholas Vasquez's substantive due process right by failing to protect him from a danger that he would not have faced but for the actions of the same state actors.

Before the United States Supreme Court formally addressed the issue in *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the concept of a state created danger existed in what are best described as the "snakepit" cases. *See e.g. Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982) ("If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit"). In 1989, the Supreme Court decided *DeShaney,* in which the Court considered the duty owed by governmental entities and their employees to protect persons from injuries caused by private third parties. *DeShaney,* 489 U.S. at 195, 109 S.Ct. 998. "As a general matter," the *DeShaney* Court concluded, "a state's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. 998. The *DeShaney* Court, however, identified two exceptions to this general rule. First, when the state takes a person into its custody, the state has a special duty to assume some responsibility for his safety and well-being. *Id.* at 199–200, 109 S.Ct. 998. The *DeShaney* Court did not specifically address the second exception to the general rule, but instead left the door open for situations where the government has helped to create the danger from private violence or has rendered a person more vulnerable to such violence. *Id.* at 201–202, 109 S.Ct. 998. It is this second exception upon which Plaintiffs base their claim.

▆ Both before and since *DeShaney* was handed down, the Eighth Circuit has held that "the Due Process Clause is implicated 'when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have been in.' " *Dorothy J v. Little Rock School District,* 7 F.3d 729, 733 (8th Cir.1993) (quoting *Wells v. Walker,* 852 F.2d 368, 370 (8th Cir.1988)). In *Carlton v. Cleburne County,* 93 F.3d 505 (8th Cir. 1996), the Court of Appeals further explained the state created danger exception, noting "[c]ases where the duty to protect has arisen have consistently involved affirmative conduct by government officials directly responsible for placing particular individuals in a position of danger." *Carlton,* 93 F.3d at 508 (citations omitted). Based on its observations, the

*Carlton* court reasoned, "the individuals would not have been in harm's way but for the government's affirmative actions." *Id.* As the *Carlton* Court stressed, "[m]ere knowledge of danger to the individual does not create an affirmative duty to protect." *Id.* at 509 (citing *DeShaney,* 489 U.S. at 200, 109 S.Ct. 998). Thus, for Plaintiffs' claim to survive summary judgment, they must show affirmative actions by government officials that placed Nicholas Vasquez in a greater position of danger than he would have otherwise faced without governmental action. The conduct must be an affirmative action that was directly responsible for Nicholas's injuries and must extend beyond simply knowing that Karl Voll was a danger. Lastly, the conduct must be so egregious or so outrageous and go beyond the bounds of negligence or even gross negligence to truly shock the conscience.

### 3. Qualified Immunity for Individual Defendants

■ In their Motion for Summary Judgment, the individual Defendants, Officers Lincoln and Wake argue that they are entitled to Qualified Immunity, and ask the Court to grant their Motion for Summary Judgment accordingly. Under the doctrine of qualified immunity, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted). In considering whether an official may rely on qualified immunity to escape civil liability, the Court measures the objective legal reasonableness of the unconstitutional act against the clearly established law at the time of the action. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (cit-

ing *Harlow,* 457 U.S. at 819, 102 S.Ct. 2727). Qualified immunity, however, does not provide government officials with a "license to lawless conduct." *Harlow,* 457 U.S. at 819, 102 S.Ct. 2727. "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate...," "[b]ut where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" *Id.* (quoting *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)). Essentially, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

The qualified immunity analysis is a two-step process. *Sexton v. Martin,* 210 F.3d 905, 909 (8th Cir.2000). The Court must first determine whether Plaintiffs have "asserted a violation of a constitutional or statutory right." *Id.* (citations omitted). Next, the Court looks at whether that right was clearly established at the time the alleged unlawful act occurred. *Sexton,* 210 F.3d at 909 (citation omitted). For a right to be clearly established, the law must give the official "fair warning" that his or her conduct would violate an individual's rights when the action was taken. *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002). In making its inquiry, the Court is reminded that state officers who "seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). After considering the separate conduct of both individually named officers in this case, the Court finds that Captain Lincoln should receive the

protections of the qualified immunity doctrine, whereas Detective Wake should not.

### a. Captain Dirk Lincoln

■ On the morning of April 5, 2001, Captain Lincoln responded to the call from Glenwood High School regarding a student caught selling a controlled substance at school. Captain Lincoln made the first contact with Jessica Whetsel and her parents, and Lincoln made the decision to call for assistance from the Task Force. When the Task Force Detectives arrived, Captain Lincoln may have remained silent regarding his previous encounters with Karl Voll. After the arrival of the Task Force Detectives, however, Captain Lincoln's role in the case diminished to that of the local advisor. With the only offense being a failure to tell the detectives of Karl Voll's history of violence, the Court cannot find that Captain Lincoln took any affirmative action that created a danger to Nicholas Vasquez. Nor can the Court conclude that Captain Lincoln's nonfeasance amounted to anything more than simple negligence. Accordingly, Captain Lincoln's Motion for Summary Judgment is granted on Plaintiffs' Substantive Due Process claim.

### b. Detective Gerald Wake

■ Defendant Detective Wake argues that he is entitled to qualified immunity because his actions did not amount to a constitutional violation in that Detective Wake took no affirmative actions that increased the danger to Nicholas Vasquez. Wake argues that the danger to Nicholas Vasquez was created by his brother, Michael's, previous relationship with Jessica Whetsel, her accusation that Nicholas had asked her to sell drugs for him, and the rumors circulating about the Vasquez brothers' intent to kidnap and harm Jessica. Moreover, Wake argues that his actions neither affirmatively placed Nicholas in danger nor did they strip Nicholas of his ability to defend himself. Rather, Defendant argues that he actually protected Nicholas from Karl Voll by placing Nicholas in jail where Karl could not reach him. Defendants' Brief states, "[Nicholas] clearly was in no danger from Voll behind bars, yet he fought to get released and ultimately paid $500.00 to be released." (Def. Br. at 8). Viewing the facts in a light most favorable to Plaintiffs, the Court finds Defendant's arguments unpersuasive.

In considering Detective Wake's actions on April 5, 2001 and beyond, the colloquialism that comes to mind is "hell-bent." For whatever the reason, be it a personal history with Avalos and her family; the prospect of participating in a sting operation involving a controlled substance he admits to having no experience with; or simply an overzealous elan for his work on the Task Force, Detective Wake appeared "hell-bent" on arresting the Vasquez brothers for distributing "opium."[21] The Oxford

---

**21.** Further evidence of Detective Wake's attitude is found in the charges for which the Vasquez brothers were arrested. Iowa Code § 124.401 makes a felony the manufacture, distribution, or possession with intent to distribute a Simulated or Counterfeit controlled substance. Iowa Code § 124A.4 defines a misdemeanor offense for the manufacture, delivery, or possession with intent to distribute an Imitation controlled substance.

Iowa Code § 124.101(25) defines "Simulated Controlled Substance" as: "a substance which is not a controlled substance but which is expressly represented to be a controlled substance, or a substance which is not a controlled substance but which is impliedly represented to be a controlled substance and which because of its nature, packaging, or appearance would lead a reasonable person to believe it to be a controlled substance."

Iowa Code § 124A.2 (4) defines "Imitation Controlled Substance" as: "a substance which is not a controlled substance but which by color, shape, size, markings, and other aspects of dosage unit appearance, and packaging or other factors, appears to be or resembles a controlled substance." Iowa Code § 124A.3 provides additional factors for con-

English dictionary defines hell-bent as "fiendishly, doggedly, or recklessly determined." *Oxford English Dictionary* (2nd Edition 1989). Reckless determination precisely describes Detective Wake's actions in making a case against Nicholas and Michael Vasquez.

Wake's first action upon meeting Jessica Whetsel and her parents was to dupe the family into believing that a fifteen year old girl was facing a forty to eighty year prison term for possessing a substance which Wake suspected was not a drug substance. Wake suggested, however, that the real culprits were the ones who had supplied the substance to Jessica, the Vasquez brothers. Accepting Karl and Maria Voll's and Jessica Whetsel's testimony as true, Wake then dangled the possibility that the charges would go away if Jessica's parents were willing to cooperate. Restated, Karl

Voll was made to believe that his teenage daughter[22] was going to jail for eighty years because of the Vasquez brothers unless Karl and Maria agreed to cooperate.

After he was told that his daughter was going to go to prison for forty to eighty years because of the Vasquez brothers, Karl Voll became understandably upset. Karl's anger, however, was not that of a typical concerned parent. Rather, Karl began making specific threats to harm or kill Nicholas and Michael Vasquez. Wake, however, disregarded Karl's threats as bravado. Moreover, Wake and Daley laughed at Karl's threats and offered encouragement to support Karl's rage. By the time the Volls had agreed to cooperate with the Detectives, Karl had become so angry that Wake decided to use Maria Voll as the confidential informant instead of Karl. Regardless of this decision, Wake

sideration to indicate whether a substance is an imitation controlled substance, but only where the appearance of the substance alone is not indicative of an imitation controlled substance. The factors include:
1) The person in control of the substance expressly or impliedly represents that the substance has the effect of a controlled substance.
2) The person in control of the substance expressly or impliedly represents that the substance, because of its nature or appearance can be sold or delivered as a controlled substance or as a substitute for a controlled substance.
3) The person in control of the substance either demands or receives money or other property having a value substantially greater than the actual value of the substance as consideration for delivery of the substance.
Comparing the two statutes reveals only two differences. The first distinction is that a simulated controlled substance is not a controlled substance but the dealer represents that it is a specific controlled substance (i.e. selling baking soda and claiming that it is cocaine), whereas an imitation controlled substance is not a controlled substance, but the dealer represents that the substance has the effect of a controlled substance (i.e. "Herbal Ecstacy" pills that are advertised as a

legal natural alternative to the real thing, but are in fact mostly caffeine and ephedra). Both statutes, however, look at the appearance, packaging, dosage, and nature of the substance to determine if it resembles a controlled substance. Under either statute, an express representation that something is in fact a controlled substance is unnecessary, and under the lesser imitation drug law, the dealer's representation is irrelevant unless the substance does not look like a controlled substance. This would appear to be is a distinction without a difference. The second distinction then is clearly the charges applied to each offense. As the same conduct could be prosecuted under either statute, the law apparently leaves the question of whether to charge someone with a misdemeanor or a felony for the same offense with the arresting officer and prosecuting attorney. Both Nicholas and Michael Vasquez were charged with felonies.

**22.** Although Jessica Whetsel is Karl Voll's stepdaughter, during his criminal trial, he referred to her throughout his testimony as his daughter. (*See* Def.App. 84–101). As well, Jessica Whetsel testified that she refers to Karl Voll as her father and that he is the only father that she has ever known. (Def.App. at 42).

allowed Karl to accompany his wife to Avalos's home with nothing more than an admonition for Karl to remain in the car. Wake neither sought nor received any supervisory approval of the use of either Voll as a CI. Though Maria was the only Voll Wake designated as a CI, the background information packet on Maria was never completed. There was no background check, no criminal history inquiry, and no fingerprints or photographs taken; because events were "happening as we go," Maria's background interview was completed once the Detectives obtained her signature on the CI agreement. Needless to say, no background check of Karl ever took place.[23]

After Karl disregarded Wake's instructions and made several direct threats to the Vasquez brothers, Wake continued to disregard Karl's behavior as overly macho bravado. Wake's indifference persisted when Karl forced the Task Force dispatch office to put a call through to Wake's home on a Saturday afternoon. Even though Karl made specific threats about guns and taking care of the Vasquez brothers himself, Wake made no record of the call, told no one about the call, never bothered to investigate Karl's ominous threat, and certainly never informed the Vasquez brothers that a violent convicted felon with a history of guns and drug and alcohol abuse was continuing to threaten them several weeks after Wake had executed his ruse. It was Wake's affirmative actions that enraged Karl Voll on April 5, 2001, and Wake's continued indifference to the safety of the Vasquez brothers that allowed Karl to arrive unquestioned at Avalos's home on the night of May 11, 2001. Such reckless

indifference towards the personal security of Nicholas Vasquez is outrageous, egregious, and truly shocks the conscience.

Defendant argues there can be no state created danger because only Maria Voll, and not Karl Voll, was signed up as a CI. The Court finds this argument unavailing. The reason Detective Wake cited for not using Karl was that Karl was too angry at the time and Wake was worried that Karl would sully the investigation by threatening the Vasquez brothers. Regardless, Defendant allowed Karl to drive his wife unescorted to Avalos's home. As well, Wake's reports indicate that both Volls were advised that they would be called to testify. Throughout the investigation and Karl Voll's criminal trial, Voll maintained that both he and his wife had made a deal with the Task Force officers and that both were involved as CIs. In the end, it would appear that the only difference between Karl Voll and Maria Voll as Confidential Informants is the partially completed CI packet for Maria.[24] As Detective Daley testified, however, the packet was merely "a formality we had to do prior to her being able to do it." (Def.App. at 194). In allowing Karl Voll to believe that he was part of the investigation and allowing him to accompany his wife on the CI assignment, Karl was as much a Confidential Informant as his wife regardless of the label the Defendants choose to assign him.

Defendants next argue that the officers' actions were not the proximate cause of Nicholas Vasquez's injuries. This is not for the Court to decide. "Causation is generally a jury question unless, in a particular case, the question is 'so free from doubt as to justify taking it from the

---

**23.** In addition to the three arrests detailed above, a NCIC background check on Karl reveals six more arrests in Ohio for charges such as carrying a concealed weapon, possession of criminal tools, and grand theft auto. The same NCIC report also carries a warning

from the state of Ohio to "Approach with Caution," and lists "Crazy Karl" as a known alias of Karl Voll.

**24.** See *infra* § III.(A)(4)(b), for further discussion of the CI information packet.

jury.'" *Ricketts v. City of Columbia*, 36 F.3d 775, 779 (8th Cir.1994) (quoting *Trudeau v. Wyrick* 713 F.2d 1360, 1366–67 (8th Cir.183)). In the present case, the question is hardly free of doubt, and a jury should decide whether Detective Wake's actions proximately caused Nicholas's injuries.

Defendants also argue that Detective Wake's actions were not immediate in time to Plaintiff's injuries. In support of their argument, Defendants cite *Dorothy J v. Little Rock Sch. Dist.*, 7 F.3d 729 (8th Cir.1993). In that case, the Eighth Circuit held that the sexual assault of a mentally disabled student by another mentally disabled student was "too remote a consequence" where the attacker had been enrolled two years before. *Id.* at 733. In a footnote, the court noted, "[i]n most every circuit court decision imposing § 1983 liability because the State affirmatively created or enhanced a danger, 'the immediate threat of harm has a limited range and duration' …" *Id.* at 733, n. 4 (quoting *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir.1993)).

The events in this case took place over the course of a month. Karl Voll called Detective Wake at home shortly before the shooting. On the actual date of the shooting, the Volls received a subpoena to testify in Michael Vasquez's criminal trial. This is a far cry from the two years at issue in *Dorothy J*. Defendants have not shown as a matter of law that immediacy is lacking here. As with causation, this question is for the jury to decide. The Court finds that Plaintiffs have identified a constitutional right that was violated when Detective Wake's affirmative actions placed Nicholas Vasquez in a greater position of danger than he would have otherwise been in absent Detective Wake's actions.

Having found that Plaintiffs have asserted a constitutional right, the Court now turns to the second prong of the qualified immunity analysis, whether that right was clearly established at the time the alleged unlawful act occurred. As set forth above, a right is clearly established if the law gave Detective Wake fair warning that his conduct would violate Nicholas Vasquez's rights when the action was taken. Here, the constitutional right asserted by Nicholas Vasquez is the right to be protected against private violence where the state "has taken affirmative actions which increase [his] danger of, or vulnerability to, such violence beyond the level it would have been at absent state action." *Freeman v. Ferguson*, 911 F.2d 52, 55 (8th Cir.1990).

As explained above, since 1988, the Eighth Circuit has recognized that the Due Process Clause is implicated "when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have been in." *Wells v. Walker*, 852 F.2d 368, 370 (8th Cir.1988). The United States Supreme Court confirmed this right in *DeShaney* in 1989, and the law of the Eighth Circuit remained consistent with *DeShaney* up through April and May of 2001, when Detective Wake's alleged constitutional violation took place. The Court, therefore, concludes that Nicholas Vasquez's right to be protected from state created dangers was clearly established when Detective Wake disregarded any semblance of the Vasquez brothers' individual safety in rushing to produce sufficient evidence to arrest them for narcotics trafficking. Accordingly, Detective Wake's actions were not objectively reasonable and his request for qualified immunity must be denied.

**4. The Southwest Iowa Multijurisdictional Drug Task Force and Its Municipal Members**

It is well established that municipalities may be sued under § 1983 only in limited

circumstances. The Supreme Court has held that a municipality may not be sued solely on the theory of *repondeat superior*; but a municipality may be liable where "that government's own policy or custom is responsible for causing the constitutional violation or injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Furthermore, "a municipality may be held liable when the illegal practice is " 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1229 (10th Cir.2001) (quoting *Cannon v. City & County of Denver*, 998 F.2d 867, 877 (10th Cir.1993)). In *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Court stated that "the 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479–80, 106 S.Ct. 1292.

In the present case, Plaintiffs argue that the policies of the Southwest Iowa Multi-Jurisdictional Task Force and its members violated Nicholas Vasqeuz's constitutional right to substantive due process. Plaintiffs first contend that the Task Force 28E Agreement was specifically designed to avoid liability by any of the municipalities for the actions of the Task Force officers. Plaintiffs argue that because of the confines of the 28E agreement, no plaintiff would ever be able to obtain municipal liability for any action of the Task Force officer based on a custom or practice. Plaintiffs, therefore, ask the Court to "pierce the veil" of the 28E agreement to hold the members accountable for the actions of the Task Force. Plaintiffs also argue that the failure on the part of the Task Force's Executive Committee to draft policies and procedures for the safe handling of confidential informants in Task Force investigations directly led to Nicholas Vasquez's injuries and, therefore, violated his constitutional rights. Because the Court agrees that Plaintiffs have stated a claim based on the Task Force policies regarding confidential informants, the Court need not address Plaintiffs' veil-piercing argument.

**a. Municipal liability as contemplated under the Task Force 28E Agreement**

 As noted above, municipal liability may only be had in § 1983 actions in limited circumstances, including where an officer's constitutional violation is part of an ongoing practice or custom of the municipality. To even approach this question in the present case, however, the Court must first determine where to attribute the actions of Detective Wake as a member of the Task Force. Defendants have argued that the 28E agreement giving rise to the task force states that the actions of an officer are attributed to the employing jurisdiction. In the case of Detective Wake, the employing jurisdiction would be Council Bluffs. Accordingly, Defendants argue that Council Bluffs cannot be held liable for Wake's actions unless Plaintiffs show a pattern and practice of unconstitutional actions by the Council Bluffs Police Department. Although Defendants' argument is somewhat inaccurate, Defendants are correct that the 28E Agreement requires Plaintiffs to look to Council Bluffs for customs, patterns or practices of unconstitutional police actions.

The applicable section of the Southwest Iowa Multi-Jurisdictional Drug Task Force Agreement is § 5. Defendants point to the sentence that reads:

If an incident occurs involving the activities of the Drug Task Force outside of the city limits of Council Bluffs, or out-

side of Mills or Pottawattamie Counties, which results in a claim or lawsuit, *the law enforcement personnel outside their respective jurisdiction shall be deemed to be performing duties arising out of and in the course of his/her employment with the governmental agency employing such law enforcement personnel.*

In their briefs and during oral argument, Defendants focused solely on the underlined language of this sentence. As the Court noted at the hearing, however, this analysis is incomplete. The sentence states both a condition and a response. Defendants, however, focus only on the response without considering whether the condition is met. Broken down, the first clause of the sentence provides the condition-if an incident occurs outside of Mills County, the rest of the sentence will apply. If the rest of the sentence applies, meaning that an incident occurred outside of Mills County, then the law enforcement personnel will be deemed to be acting on behalf of their employing jurisdiction. Here, however, the incidents giving rise to this cause of action occurred inside of Mills County. As the condition in the first clause is not satisfied, the sentence does not apply and the Court has no reason to consider the response to the condition.

When the Court questioned Defendants about the liability clause, Defendants responded by suggesting that the Court had misunderstood and that the meaning of the sentence would become clear when the whole section of the Agreement was reviewed. After reviewing § 5 in its entirety, however, the answer is anything but clear. What is clear is that the sentence Defendants persist in quoting is inapplicable to the present case. The portion of § 5 that does apply here is found in the two paragraphs directly preceding the above-quoted language. When put with Defendants' quoted language, the complete § 5 reads in relevant part:

It is further expressly agreed that all law enforcement personnel rendering aid outside their jurisdiction pursuant to this agreement shall be performing duties arising out of and in the course of his/her employment with the governmental agency employing such law enforcement personnel.

Any claims or lawsuits ... which are brought against the task force members of this agreement, and/or their agents and employees, arising out of the activities of the drug task force shall be defended by the member from the jurisdiction in which the incident occurred which gave rise to the claim and/or lawsuit. The member who has this duty to defend shall also indemnify, defend, and hold the other members harmless from any and all claims, lawsuits and liability.

If an incident occurs involving the activities of the Drug Task Force outside of the city limits of Council Bluffs, or outside of Mills or Pottawattamie Counties, which results in a claim or lawsuit, the law enforcement personnel outside their respective jurisdiction shall be deemed to be performing duties arising out of and in the course of his/her employment with the governmental agency employing such law enforcement personnel.

One must first note the similarity between the first paragraph and the third paragraph. While the third paragraph states that actions of the officers will be attributed to their employing jurisdiction only when incidents occur outside of the relevant areas, the first paragraph appears to state the exact same thing without setting a territorial limit. As a result, the actions of a Task Force officer will always be attributed to the employing agency. If so, why include the third paragraph? As well, if the actions of a Task Force officer are always ascribed to the employing agency, why include the duty to defend

language in paragraph two that places the burden of defense and indemnity on the community that called in the task force? The answer, as Plaintiffs' counsel suggested during oral argument, appears to be a tactic to make it as difficult as possible for anyone to hold the individual municipalities liable for the actions of the Task Force.

As applied to the present action, the result of these provisions is as follows. The incidents occurred in Glenwood which is in Mills County. Under the second paragraph, either Mills County or Glenwood has a duty to defend, indemnify, and hold the other municipalities harmless for the incidents giving rise to the lawsuit. The City of Glenwood and Mills County are both named members of the Task Force, and the incidents giving rise to the lawsuit happened specifically in Glenwood. The logical inference one can make from the second paragraph is that the duty to defend and hold harmless lies with Glenwood alone; all other municipal defendants would, therefore, drop out of the case.

If the other municipalities were to be dismissed from the case, the remaining parties would be Detective Wake and the City of Glenwood. Because Officer Wake is employed with the City of Council Bluffs, the first paragraph states that his actions arose out of and were in the course of his employment with the governmental agency that employs him, or Council Bluffs. Thus, Glenwood has the duty to defend, but to show a pattern, practice, or custom, one must look at the actions of the Council Bluffs Police Department. Accordingly, Plaintiffs' arguments regarding the customs and practices of the municipal Defendants must be examined in terms of the Council Bluffs Police Department. Plaintiffs have not offered any evidence of unlawful customs, patterns, or practices on the part of the Council Bluffs Police Department. Under the terms of the agreement though, even if Plaintiffs could prove that the Council Bluffs Police Department has a pattern, practice or custom of constitutional violations, Glenwood would bear the entire burden for Council Bluffs' unconstitutional acts. The result is that Plaintiffs have a very difficult, if not impossible, task to ever obtain liability over a municipality for the actions of the individual Task Force officers.

### b. Municipal Liability based on official Task Force policies and procedures

■ Although the Task Force 28E Agreement does its best to skirt any possibility of municipal liability based on patterns, practices or customs, Plaintiffs have also challenged the official policies and procedures of the Task Force. As noted above, administration of the Task force is left to an Executive Committee comprised of representatives from each participating municipality. Among other things, the Executive Committee is required to establish "uniform rules and regulations for the giving and receiving of aid." 28E Agreement § 4. Plaintiffs argue that the rules and regulations (or policies and procedures) governing Task Force use of confidential informants created the danger that ultimately led to the tragic shooting of Nicholas Vasquez.

The Task Force policies and procedures currently in place were ratified in 1995, four years before the formation of the current Task Force. Thus, the Executive Committee has not established any new rules and regulations since its inception. The Southwest Iowa Narcotics Enforcement Task Force Policies and Procedures manual include a section titled "Confidential Informant Management." Under the "General Procedures" section, the manual recognizes that "a CI may be in a position to want to do physical or professional harm to an employee or another member of society for their own personal motives

or gains." The manual then lists several ways to avoid allowing a CI to harm members of the Task Force, but other members of society are never mentioned again.

The manual does contain more specific information on the handling of informants, but it is the manual's omissions that are of greater significance in this case. The United States Attorney General publishes guidelines for the use of confidential informants. *See* The Attorney General's Guidelines Regarding the Use of Confidential Informants, May 30, 2002 ("AG Guidelines"). As well, the International Association of Chiefs of Police publishes model guidelines for the use of confidential informants. *See* IACP National Law Enforcement Policy Center "Confidential Informants" Concepts and Issue Paper and Model Policy, June 1, 1990 ("Model Policy"). Comparing these two sets of guidelines with the Task Force manual reveals a number of glaring deficiencies. The Model Policy list several steps that must be completed before an individual may be used as a CI:

1) An officer must receive initial approval from a supervisor authorized to make such approval.

2) The officer shall compile sufficient information through a background investigation in order to determine the reliability and credibility of the individual.

3) After the officer receives initial approval to use an individual as a CI, an informant file shall be opened.

4) All persons determined to be unsuitable for use as a CI shall be referenced in the Unreliable Informant File.

5) An officer wishing to utilize an unreliable informant shall receive prior approval from the chief executive officer, or his or her designee.

Model Policy at 2.

Once approved under the Model Policy, the CI must then sign and abide by an informant agreement. The officer using the CI must also discuss the terms of the agreement with the CI.

Under the AG Guidelines, before an individual may be used as a CI, a case agent must complete and sign a written "Initial Suitability Report and Recommendation." AG Guidelines at 8. In completing the initial report, the agent must address seventeen separate factors including:

a. the person's age;

b. the person's alien status;

e. the extent to which the person's information or assistance would be relevant to a present or potential investigation or prosecution and the importance of such investigation or prosecution;

f. the nature of any relationship between the CI and the subject or target of an existing or potential investigation or prosecution, including but not limited to a current or former spousal relationship or other family tie, and any current or former employment or financial relationship;

g. the person's motivation in providing information or assistance, including any consideration sought from the government for this assistance;

h. the risk that the person might adversely affect a present or potential investigation or prosecution;

j. the person's reliability and truthfulness;

l. whether the person has a criminal history, is reasonably believed to be the subject or target of a pending criminal investigation, is under ar-

rest or has been charged in a pending prosecution;

m. whether the person is reasonably believed to pose a danger to the public or other criminal threat, or is reasonably believed to pose a risk of flight;

n. whether the person is a substance abuser or has a history of substance abuse; and

p. the risk of physical harm that may occur to the person or his or her immediate family or close associate as a result of providing information or assistance to [law enforcement].

AG Guidelines at 8–9.

Once the initial report is completed, the case agent must forward the written report to a Field Manager for his or her written approval. If the Field Manager gives written approval, the individual may be registered as a CI. In registering a CI, local law enforcement must, at a minimum, document or include the following in the CI's files:

1. a photograph of the CI;

2. the [local law enforcement agency's] efforts to establish the CI's true identity;

3. the results of a criminal history check for the CI;

4. the Initial Suitability Report and Recommendation;

5. any promise or benefits, and the terms of such promises or benefits, that are given a CI by [any law enforcement agency];

6. any promises or benefits, and the terms of such promises or benefits, that are given a CI by any [federal,] state or local prosecuting office; and

7. all information that is required to be documented in the CI's files pursuant to these Guidelines (e.g.) [the provisions of the CI instructions set forth in continuing sections of the Guidelines].

AG Guidelines at 11.

Under the Task Force policies and procedures, before an individual may be utilized as a CI, the individual must sign and have explained to him or her a "Conduct of Confidential Informant" form; the CI must be instructed not to commit a criminal act; entrapment must be explained to the CI; and the CI must be told that the Task Force will attempt to protect the informant's confidentiality, but this cannot be guaranteed. There is no requirement that the Task Force officers obtain any criminal history information or any background information whatsoever. Most alarming, however, is that the Task Force officers need not seek or receive any approval before using a CI. There is no review process, which allowed Wake and Daley to coerce the Volls into cooperating with the threat of an eighty year jail term for their daughter should they refuse.

Even, however, if the written policies of the Task Force were sufficient, which they are not, it would matter little. When asked about written policies or procedures for the use of confidential informants, Detective Daley testified that he did not know if there were any written procedures as he had never seen them. In utilizing Maria Voll as a CI, Detective Daley testified that signing Maria up was simply "a formality we had to do prior to her being able to do it." Def.App. at 194. In describing the process of signing Maria up as a CI, Daley testified:

In cases like this, the process is simply having—there's a couple like disclosure statements she has to read in the packet and sign. And I think they have to initial next to them and acknowledge that they read them and understand them and agreed to that. There's a personal history section where we got,

you know, all of her personal history information. You know, employers, work phone numbers, all those kinds of things. A complete packet entails criminal history, fingerprint cards, photographs in that packet. And then ideally, you get all that together and your packet's complete. But when we have situations like this, where it's happening as we go, our only requirement is to have that packet filled out, signed, and they understand what's going on.

Def.App. at 194–195.

The reality of the situation is that this was not a situation "where its all happening as we go." The only element of immediacy added to the situation was created by the fact that the Volls were scared parents being told that their daughter was facing a jail term commiserate with that of murderers and kidnappers. Had the Detectives delayed, the Volls might have had an opportunity to decide that they did not want to be involved in a sting operation and perhaps to consult with someone who could tell them that Detective Wake's threatened sentence was outlandish. Moreover, had the Task Force policies and procedures compelled the Detectives to complete a background report and receive supervisor approval before utilizing either Voll as a CI, Karl Voll's violent criminal history would have prevented him from being anywhere near the Avalos home; the Volls would not have received a subpoena on the morning of May 11, 2001; and Nicholas Vasquez would not have had to relearn the alphabet because of the damage caused by shrapnel that still remains lodged against the back of his skull. *See Omaha World Herald,* 1b (Nov. 28, 2001). The policies and procedures of the Task Force, however, did not compel the officers to seek any form of approval, or give any further thought to sending angry parents as confidential informants on a drug sting operation while their daughter waited in jail expecting to go to prison for

the next eighty years. The inadequacies in the Task Force policies are simply appalling, particularly when contrasted with the policies and procedures employed by other law enforcement agencies as described above. The failings of the Task Force policies and procedures truly shock the conscience.

Having decided that Plaintiffs may proceed with their case against the municipal Defendants based on the Task Force policies and procedures, the Court is left with the same conundrum as before based on the terms of the Task Force 28E agreement. As noted above, the second paragraph of section 5 of the Agreement contains a duty to defend and hold harmless for the municipality in which the events occurred. Under this provision, the City of Glenwood would be solely responsible for the deficient policies of the entire Task Force. The policies and procedures are supposedly drafted and approved by the Executive Committee which includes representatives from each member. As none of the parties have raised this issue before, however, the Court sees no need to address it now. Defendants' Motion for Summary Judgment as it relates to the municipal Defendants is denied on Plaintiffs' first claim for substantive due process.

**B. Equal Protection**

Plaintiffs' second claim alleges that the individual and municipal Defendants violated Plaintiffs' rights to equal protection of the law as guaranteed by the Fourteenth Amendment. Plaintiffs' equal protection claim stems both from years of alleged harassment and discrimination at the hands of the Glenwood Police Department and the Mills County Sheriff's Department, and from the actions and attitudes of the individually named Defendants and the Glenwood Police Department during the

events surrounding Nicholas's shooting. As an initial matter then, Plaintiffs' claim under the Equal Protection Clause does not implicate the City of Council Bluffs, Harrison County, or Pottawattamie County, and these parties are entitled to summary judgment. The same holds true for Plaintiffs' third and fourth claims under the Fourth Amendment and for conspiracy. Summary judgment is, therefore, granted for the City of Council Bluffs, Harrison County, and Pottawattamie County on each of these three claims.

 Plaintiffs allege that they have been the victims of years of racial discrimination and harassment at the hands of the individually named Defendants, the Glenwood Police Department, and the Mills County Sheriff's Department. Essentially, Plaintiffs allege that they have been subjected to numerous traffic stops and unreasonable searches and arrests on account of their race. To prevail on such a claim, Plaintiffs must prove both a discriminatory purpose and discriminatory effect. *Johnson v. Crooks,* 326 F.3d 995, 999–1000 (8th Cir.2003) (citing *United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)). "When the claim is selective enforcement of the traffic laws or a racially-motivated arrest, the plaintiff must normally prove that similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory effect and purpose." *Id.* at 1000 (citing *Chavez v. Ill. State Police,* 251 F.3d 612, 634–48 (7th Cir.2001); *Gardenhire v. Schubert,* 205 F.3d 303, 319 (6th Cir.2000)).

Here, Plaintiffs present no evidence of disparate treatment between themselves and non-Hispanics in similar situations. Plaintiffs simply recount a number of encounters between themselves and the police. As the Eighth Circuit noted in *Johnson,* "a prima facie equal protection claim may also be proved by direct evidence of racial discrimination in this type of case." *Johnson,* 326 F.3d at 1000. Here again, however, Plaintiffs offer no direct evidence of discrimination. In the present case, as in *Johnson,* Plaintiffs rely on their own personal opinions that they were stopped, investigated, or otherwise came into contact with police on account of their race. At the summary judgment stage, Plaintiffs must "identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." *Id.* (quoting *Crawford–El v. Britton,* 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998))). "The combination of an arbitrary stop and a difference in race between the person stopped and the officer" does not establish a prima facie case of racial discrimination. *Id.* (quoting *Ford v. Wilson,* 90 F.3d 245, 248 (7th Cir.1996). In the present case, Plaintiffs have offered no evidence of discrimination apart from the variance in race between themselves and the Glenwood and Mills County police officers. Defendants' Motion for Summary Judgment is granted on Plaintiffs' Equal Protection claim.

## C. Fourth Amendment

Plaintiffs next claim that they have been subjected to a number of unlawful searches and seizures at the hands of Defendants in violation of the Fourth Amendment. In support of their claim, Plaintiffs point generally to the numerous traffic stops over the years for appearing on a suspended license list. Plaintiffs also point specifically to the stop of Michael Vasquez in the summer of 2000 when his car was searched for forty-five minutes while Michael sat handcuffed either on the curb or in the back of Officer Martin's patrol car; Nicholas's arrest for marijuana possession at the lake; Michael's arrest at a Mills County motel; and the late night search of the Avalos home by Task Force officers searching for marijuana.

Plaintiffs' Fourth Amendment claim in large part overlaps and coincides with their Equal Protection claim. That is, Plaintiffs allege not that the stops, searches, or arrests were without probable cause, but that they were singled out by police on account of their race. "The Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Plaintiffs have offered nothing to suggest that the arrests of either Nicholas or Michael for marijuana possession were without probable cause. Neither do Plaintiffs allege that the search warrant executed by Task Force officers in February 1999 was obtained without probable cause. Rather, Plaintiffs contend that they were singled out from others in these instances because of their race. Plaintiffs' allegations, therefore, are properly described as claims under the Equal Protection clause and not the Fourth Amendment. The Court has already addressed Plaintiffs' Equal Protection claim and need not do so again.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Temporary detentions of an individual during a traffic stop by police amounts to a seizure under this provision even if only for a short time and for a limited purpose. *Whren,* 517 U.S. at 809–810, 116 S.Ct. 1769 (citations omitted). Generally, however, the decision to stop a vehicle is reasonable where the police have probable cause to believe a traffic violation has occurred. *Id.* It matters not how minor the violation, or even if the traffic violation is simply a pretext to allow the officer to stop the vehicle. *Id.* at 811–13, 116 S.Ct. 1769; *Conrod v. Davis,* 120 F.3d

92, 96 (8th Cir.1997) (quotation omitted) cert. denied 523 U.S. 1081, 118 S.Ct. 1531, 140 L.Ed.2d 681.

The large majority of the complained of traffic stops involve one of the Plaintiffs being stopped because · his or her name appeared on the State suspended license list. An officer who identifies an individual whose name appears on the list would certainly have probable cause to believe that a traffic violation has occurred. Without more, the stop is valid and Plaintiffs arguments that the stops were used as subterfuges to search for other illegal activities are without merit.

The remaining incident, however, during which Michael Vasquez was pulled over, handcuffed and made to sit on the curb while Officer Martin conducted a forty-five minute search of his vehicle is highly suspect. This search and seizure appears to have been devoid of any probable cause for lawful arrest. Officer P. Martin, the arresting officer in the incident is, for some reason, not a Defendant in this action. His individual actions, therefore, must go unquestioned. As well, one suspect stop is not evidence of a custom, pattern or practice of such behavior attributable to the municipality as a whole. As Plaintiffs have identified no other incidents of search or seizure without probable cause, Plaintiffs' Fourth Amendment claim must fail. Defendants' Motion for Summary Judgment is **granted** on Plaintiffs' third claim under the Fourth Amendment.

**D. Conspiracy**

Plaintiffs' fourth claim alleges that the individual Defendants, Detective Wake and Captain Lincoln, conspired to violate Plaintiffs' civil rights. Specifically, Plaintiffs allege that Defendants Wake and Lincoln conspired to allow Karl Voll to kill Michael and Nicholas and then failed to protect the brothers in furtherance of the conspiracy.

Plaintiffs point to the years of alleged harassment, the Task Force Detectives laughter and encouragement upon hearing Karl Voll's threats, and comments made by officers at the scene of Nicholas's shooting as evidence of a conspiracy to violate Plaintiffs' civil rights.

To support a claim for conspiracy, Plaintiffs must prove that the Defendants had a "meeting of the minds" regarding the specific unconstitutional acts. *Rouse v. Benson*, 193 F.3d 936, 943 (8th Cir.1999). Here, Plaintiffs can point to no evidence that suggests that such a meeting of the minds took place. Rather, Plaintiffs ask the Court to consider several independent events that involved many actors other than Wake and Lincoln, and to conclude that a conspiracy must have been in place. The goal for the nonmoving party in resisting a motion for summary judgment is to identify disputed material facts that, if proven, could allow a jury to find in that party's favor. Plaintiffs here have failed to meet this burden. Defendants' Motion for Summary Judgment is, therefore, **granted** on Plaintiffs' fourth claim for conspiracy.

### E. Negligence

 Plaintiffs sixth and final claim against the Defendants relies upon state common law to allege that Defendants were negligent in failing to protect Nicholas Vasquez from a state created danger. Iowa Code § 670.2 expands the doctrine of *respondeat superior* to hold Iowa's political subdivisions liable for the torts of their employees. Iowa Code § 670.4 states a number of express limitations to this liability including claims where damage is caused by a third person. § 670.4(10). Iowa Code § 670.12 attaches the same limitations of liability to municipal employees sued in their individual capacities. As Karl Voll, who was not an employee of any of the named municipalities, actually caused the harm to Nicholas Vasquez, De-fendants argue that § 670.4(10), and § 670.12 provide the individual and municipal Defendants with immunity from Plaintiffs' state law claim. Plaintiffs have not challenged Defendants' argument, and the Court sees no compelling reason to do so at this time. Defendants' Motion for Summary Judgment is therefore granted on Plaintiffs' sixth claim for negligence.

### IV. ORDER

Defendants' Motion for Summary Judgment is **denied** for all Defendants except Captain Dirk Lincoln on Plaintiffs' first claim for violation of Plaintiffs' substantive due process rights. Captain Lincoln is entitled to qualified immunity and his Motion is, therefore, **granted** on all claims. Defendants' Motion for Summary Judgment is **granted** for all Defendants on claims two through six. As Michael Vasquez is not a party to the first claim, he is hereby dismissed from this lawsuit.

IT IS SO ORDERED.